AARON SHANNON v. THE STATE.

*No. 494.   Decided December 1st, 1894.*

1. **Manslaughter—Provoking a Difficulty—Self-Defense.**

There is no question that one may speak, in a quiet and peaceable manner, to another about derogatory charges or statements made and circulated by such other person against him without intending or even desiring to provoke a difficulty; and, knowing such other person is armed, he may also arm himself, where his intention is not to provoke a difficulty or produce an occasion for injuring the other, but to protect himself, if necessary, in self-defense. And if, under such circumstances, his adversary not only persists in his insulting and derogatory charges, but makes a violent assault upon him in which he kills his assailant, he cannot be held guilty of any crime.

2. **Same.**

In order to affect a forfeiture of the right of self-defense upon the ground that the defendant provoked the difficulty, he must knowingly and willingly have used the language or done the acts reasonably calculated to lead to an affray or deadly conflict; and unless his acts and conduct were clearly intended to have such effect, his right of self-defense is not compromitted by the fact that he armed himself before seeking the interview which resulted in the homicide.

3. **Manslaughter—Evidence.**

See evidence held insufficient to support a judgment of conviction for manslaughter.

APPEAL from the District Court of Washington. · Tried below before Hon. ED. R. SINKS.

This appeal is from a conviction for manslaughter, the punishment assessed being a term of two years in the penitentiary.

On the 4th day of January, 1895, appellant killed one J. R. Clay, in the town of Independence, Washington County.

Appellant and deceased were both young men, moving in the same social circles, and both of them of good character and courage. A misunderstanding between them occurred at church on one Sunday evening in the presence of ladies, and deceased was then armed with a pistol and appellant unarmed. Afterwards deceased spoke in terms of contempt of appellant to their mutual friends. Appellant, feeling compelled to notice it, and knowing deceased was armed, borrowed a pistol, having none of his own, and on the day of the homicide was standing near a store at which a number of persons were collected. Deceased rode up to the crowd on a large and spirited horse, and was talking to them when appellant, in a quiet manner, called to deceased that he wanted to see him. Deceased rode to him and they began talking, but in tones so low as to be inaudible to the crowd of by-standers only ten steps off. The interview was suddenly interrupted by deceased raising himself on his horse, and in a loud voice exclaiming, "What I said then I say now!" Appellant then replied, "If you say I am a damned coward, you are a damned liar." Deceased again repeated, "What I said then I say now;" and appellant said, "You are a lying son of a bitch." Deceased spurred his horse and attempted to ride down appellant, but he caught the reins near the bits and prevented it, and then drew his pistol but held it down by his side; the parties talking and deceased trying to jerk his reins away and ride over appellant. Appellant then struck deceased with his pistol, using it as a bludgeon, when it fired accidentally; deceased then drew his pistol and began firing on appellant, who returned the fire and killed him. After the homicide, appellant, according to one witness, stated that "Whoever ran a hog over him, or insulted him in the presence of ladies, was left."

The salient features of the case will be shown from the following extracts from the testimony of the State's witnesses

Styles testified for the State: "I went up town about three-quarters of an hour before the difficulty. I saw the defendant and a lot of boys on Page's gallery; they were running on, laughing and joking; after I had been there awhile I heard one of the boys remark, 'There comes Aaron, he has been home, changed his hat and is ready for a scrap.' I looked up and saw Aaron coming from the direction in which he lived; I did not notice when he left the crowd, or how long he had been gone. He came up to the crowd, sat down by me and talked about me making a crop. I got up and went to Welch's shop; I noticed J. R. Clay sitting on his horse at the shop; he could not be seen from where defendant and I were sitting. When I came out of the shop, J. R. Clay was sitting on his horse at the west end of Page's gallery; I walked up to him and spoke; he replied in a pleasant manner; he was laughing and talking; Aaron Shannon was some ten or fifteen feet in front of Page's store, and said, 'Jim, I want to see you a minute;' Clay said, 'All right,' and rode out to where he was. I did not hear the first words that passed

between them; I supposed they were talking about a sociable that was to take place. After they had been talking awhile—the words I did not hear—I glanced up and noticed Shannon was agitated or excited. I then heard Clay say, 'What I said then, I say now.' Shannon then said, 'If you say I am a damned liar or coward, you are a damned pusillanimous liar.' Clay repeated, 'What I said then, I say now.' Shannon then said, 'you are a damned pusillanimous son of a bitch.' Clay then spurred his horse forward and tried to ride over Shannon. Shannon caught the bridle rein near the bits with his left hand, and drew his pistol with his right hand; he held it down by his side and continued to talk—Jim Clay was talking at the same time, exchanging words. Shannon then struck Clay once or twice with his pistol. Dr. Waters ran out to where they were. I heard Clay say, 'He has got it; let him use it.' I heard a pistol shot; then Clay reached back to his saddle pocket and got his pistol, threw it over to where Shannon was, and the firing began very rapidly. I don't know how many shots were fired. I saw Dr. Waters fall; Dr. Burford, myself and John Shannon was at the body of Dr. Waters. I saw Aaron Shannon come out of Page's store; he had a pistol in his hand, going in the direction of home. Dr. Burford said, 'you had better go home to your mother;' Shannon then said that 'whoever tries to run a hog over me, or insults me in the presence of ladies, is left." This witness testified for the defense, on cross examination: "When I first saw the defendant, he was in a pleasant humor, and talked to me about farming; and he was engaged in a boyish conversation, laughing and talking and joking. I understood they had all been playing leap-frog; all seemed to be in a good humor. Clay was riding a big stallion, about 16 hands high, and would weigh 1000 pounds. When defendant called Clay, he spoke in a pleasant manner; there was nothing in his manner or the words he spoke that would indicate that he was the least mad, or wanted to raise a row. I did not hear the first of the conversation; whatever was said, was said in a moderate tone of voice, and nothing was said then that made me think defendant was mad or excited. The first words I heard was Clay say, "What I said then, I say now." Shannon said, "If you say I am a damned coward, you are a damned liar;" then Clay attempted to ride his horse over him; defendant took hold of the bridle rein and drew his pistol, but held it by his side and made no attempt to use it. Clay said something, or done something; and kept on trying to ride his horse over defendant, and tried several times to jerk the reins out of defendant's hand. Then defendant struck Clay with his pistol. Clay continued to try to ride his horse over him. The remark made by one of the boys, that Aaron had changed his hat and was coming for a scrap, was in fun, and meant he was going to tussle or wrestle with some of the boys that he had been playing with. Defendant had not changed hats that I know of. Defendant said nothing, or done nothing during the time to show that he was in ill humor; I am positive defendant never took hold of the bridle reins until Clay tried to ride his horse over him. The horse was a spirited animal."

Dr. Burford testified for the State: "As to the character of the wounds, etc., and that he was about sixty yards off; saw Clay trying to ride his horse over defendant; the first shot was from Shannon's pistol; I think it went off accidentally while Shannon was striking at Clay; it went wide of the mark; it did not strike Clay. I told Shannon, after the shooting, 'Aaron, go home, to your mother.' I did not hear him make any reply; did not hear him say, 'they can't run any hog over me, or insult me in the presence of ladies.'"

Bryan testified for the State: "That he loaned the pistol to defendant on Monday morning, January 1st, 1894; it was a double action pistol. Defendant brought me his shot gun in place of it. I had loaned defendant the pistol once before—(about six months before); he returned the pistol about four days after the difficulty. I have known the defendant 10 years; he is a quiet, peaceable boy; never heard of him having a row before. He is regarded as being a most exemplary boy."

Lipscomb testified for the State: "I saw Shannon call Clay to where he was standing; they talked about something; I could not hear; I was close by them. I saw Clay spur his horse and Shannon grabbed the bridle rein, and pulled his pistol, and struck at Clay and hit him on the leg; the pistol fired in the air; did not hear any cursing. Aaron did not look mad when he called Jimmie; they did not talk loud until Jimmie tried to ride over him. Aaron held his pistol by his side, and tried to keep him from riding over him, before he struck him on the leg."

Harrison testified for the State: "I heard Shannon and Clay talking or disputing about something; I heard Shannon ask Clay if he called him a damned coward? Clay said he did, and he was a damned liar, and Shannon called him a liar; Clay tried to ride his horse over him; Shannon pulled his pistol and began to strike Clay; the pistol was discharged accidentally; Clay then got his pistol; Shannon was in his shirt sleeves; defendant did not draw his pistol or catch the reins before Clay tried to ride over him. I am the boy that made the remark, 'Aaron has changed his hat and wants a scrap'; this was said in fun, and I meant that Aaron was going to wrestle with some of the boys, as they frequently do. If he had changed his hat I did not know it. Before defendant ever attempted to pull his pistol or strike Clay, Clay tried to ride his horse over him, and defendant was holding the bridle rein, trying to prevent him. I was about fifteen feet from them."

Williams testified for the State: "I was at the church on the night of December 31st, 1893; I went there with J. R. Clay; Aaron Shannon was there; they had a row and separated unfriendly; Clay had his pistol with him; I saw Clay at the shop the evening of the killing; I showed him a list of the names of girls to go to the sociable; he saw defendant's name on the list and said, 'if I were you I would scratch that damn rascal's name off.'"

*Rogers & Herbst*, for appellant.

*Searcy & Garrett* and *R. L. Henry*, Assistant Attorney-General, for the State.

SIMKINS, JUDGE.—Appellant was convicted of manslaughter, and his punishment fixed at two years in the penitentiary. Appellant and deceased were young men, under 19 years of age, living in the town of Independence, both of good character, and social position. Deceased was, perhaps, high spirited, had had some previous difficulties, and usually went armed. Appellant was exemplary in his life. This was his first difficulty, and he borrowed the pistol used in the homicide, having none of his own. The issue in the case was whether appellant provoked the difficulty which led to the homicide, and, if so, with what intent. The charge of the court was clear, and instructed the jury that, if appellant provoked the quarrel for the purpose of killing deceased, it would be murder, though done in self-defense; if only for the purpose of inflicting a battery, it would be manslaughter. If the interview was requested in a friendly spirit, to settle a difficulty or misunderstanding, and appellant killed in defense of his life, it would be justifiable homicide. The jury having found manslaughter, the question arises, do the facts proven to have attended the homicide show an intent or purpose on the part of appellant to provoke a difficulty? If deceased was the aggressor, without provocation on the part of appellant, the latter cannot be held responsible. There is no question that one may speak to another about derogatory charges or statements made or circulated by such other person against him, without intending or even desiring to provoke a difficulty; and, knowing such other person is armed, he may also arm himself, not to provoke a difficulty or to produce an occasion for injuring the other, but to act, if necessary, in self-defense. If, then, in an attempt to adjust the trouble or reach an understanding, without any provocation on defendant's part, the insult or charge complained of is not only persisted in, but publicly repeated, and defendant, roused to passion thereby, replies in terms equally insulting, and is immediately attacked, and finally kills, but only in defense of his life, we cannot hold him guilty of any crime. To hold otherwise would be to deny a man the right to notice any insult or interrogate the author of any charge because he would forfeit the right to defend his life if he should be attacked. The tendency of the right to abuse is no answer to the right itself. The fact that one with a grievance arms himself, and seeks an interview with the man who wrongs him, is not necessarily a provocation, nor does it place the injured party necessarily in the wrong. He must also, as said by Judge Hurt in Cartwright's Case, 14 Tex. Crim. App. 502, "willingly and knowingly use language or do acts reasonably calculated to lead to an affray or deadly conflict"; and, unless the acts are clearly calculated or intended to have such an effect, the right of self-defense is not compromitted, even though the party armed himself and went there

for the purpose of a difficulty. White's Case, 23 Tex. Crim. App. 164. There is nothing in this record that shows appellant was the aggressor, or that he used language or did anything reasonably calculated to provoke a difficulty. He invited deceased to an interview in a quiet and peaceful manner. They spoke in low tones, inaudible to bystanders fifteen feet away. Deceased first began the difficulty by loudly stating "that what he had said then he said now." There was no question about what he meant, for appellant instantly replied, "If you say I am a damned coward, you are a damned liar." Again deceased repeated the remark, and appellant replied, and then deceased attempted to ride him down with a large and spirited stallion upon which he was mounted, and was only prevented from doing so by appellant catching the reins near the bit. He then drew his pistol, and holding it down by his side, a struggle ensued, deceased endeavoring to jerk his reins away and ride over appellant, both parties talking excitedly. Finally, appellant, using his pistol as a bludgeon, struck deceased, who thereupon drew his pistol and began firing, when appellant shot and killed him. In the record as presented, the deceased appears the aggressor throughout. Enough is shown in the statements of the parties to show that young Shannon had been insulted, and remarks made about him calculated to bring him into contempt among his associates, and, when he sought an explanation, he was met with a repetition and public avowal of the charge. When he replied in similar terms to the insult, he was violently attacked by an effort to ride him down. Had he killed deceased then, it would have been in self-defense; but he held the pistol down, and only when the effort was continued to ride over him did he begin to use it as a bludgeon, and finally killed, after deceased had opened fire upon him. Defendant acted on the defensive only. But it is insisted by the State that, after the homicide, appellant remarked to Dr. Burford, who told him to go on home, "that any man who ran a hog over him [appellant] or insulted him in the presence of ladies, was left"; and that such a remark was evidence of malice aforethought, and clearly shows that appellant brought on the difficulty for the purpose of killing deceased. It is to be observed that of the ten bystanders, most of whom testified for the State, but a single State's witness testified to this remark. Dr. Burford said he heard no such remark, and the jury, to whom this issue of murder was fairly presented in the charge of the court, practically say they do not believe appellant brought on the difficulty with the purpose of killing deceased; and we think the evidence clearly sustains the correctness of this finding. But, concede the remark was in fact made, it simply tends to prove that appellant had a grievance which impelled him to seek an explanation, to-wit, that deceased had characterized him, in the presence of ladies, as a coward. But the vital question in the case—whether the interview was sought for the purpose of provoking a difficulty—must be clearly shown by the facts attending it, and not alone by the remarks of an excited boy amidst the bloody circumstances of his first difficulty. We do not feel

satisfied with the verdict, and think a new trial should have been granted. The judgment is reversed, and cause remanded.

*Reversed and remanded.*

Judges all present and concurring.