## FRED S. FRANKS v. THE STATE.

### No. 4084. Decided November 18, 1908.

**1.—Murder—Self-Defense—Provocation—Explanation.**

Where upon trial for murder the theory of the State was that the defendant shot the deceased without legal provocation, and that of defendant that the deceased started in the direction of his house as if to get a gun and that defendant asked him to stop and when deceased did not respond shot at him to strike him in the leg; there also being testimony as to a previous difficulty, the court was not required to charge on self-defense. Following Lynch v. State, 24 Texas Crim. App., 350, and other cases.

**2.—Same—Charge of Court—Intent to Kill.**

Where upon trial for murder the evidence showed that defendant shot deceased either for the purpose of killing him or inflicting upon him serious bodily injury, there was no error in the court's charge submitting murder in the second degree and manslaughter.

**3.—Same—Charge of Court—Provocation.**

Upon trial for murder where there was no evidence of insulting conduct to a female relative, and if there was any legal provocation that it arose at the time of the difficulty, there was no error in the court's charge that the provocation must arise at the time of the difficulty and must not be the result of a former provocation.

**4.—Same—Charge of Court—Cooling Time—Manslaughter.**

Where upon trial for murder there was evidence of an assault by deceased upon defendant with a knife and rock during a former altercation which occurred some two hours before the homicide, and the court charged upon manslaughter and cooling time upon this evidence; and the evidence further showed that the defendant shot at deceased deliberately at the time he killed him either with intent to kill or to inflict serious bodily injury, the court's charge on manslaughter was favorable to defendant and he could not complain.

**5.—Same—Charge of Court—Self-Defense.**

Where upon trial for murder the evidence showed that some two hours before the homicide there occurred an altercation between defendant and deceased; that thereafter the defendant rode three miles, changed his horse, procured a gun, returned within a quarter of a mile to where the deceased was in the habit of milking his cow, hitched his horse and walked to the cow-pen, found him there, called him up from behind and inflicted a wound upon him from which he died in thirty minutes, the issue of self-defense was not raised, and even manslaughter was not in the case.

Appeal from the District Court of Maverick. Tried below before the Hon. Thomas J. Murray, special judge.

Appeal from a conviction of murder in the second degree; penalty, ten years imprisonment in the penitentiary.

The opinion states the case.

*Walter Gillis, Henry I. Moore, Sanford & Douglas* and *C. K. Mc-Dowell,* for appellant.—On question of provocation: Stewart v. State, 52 Texas Crim. Rep., 273; 106 S. W. Rep., 685; Whaley v. State, 9 Texas Crim. App., 305; Niland v. State, 19 Texas Crim. App., 166; Richardson v. State, 28 Texas Crim. App., 216; Martin v. State, 40 Texas Crim. Rep., 660; Green v. State, 32 Texas Crim. Rep., 298; Tippet v. State, 37 Texas Crim. Rep., 186; Arcia v. State, 28 Texas Crim. App., 198; Johnson v. State, 29 Texas Crim. App., 150; Johnson v. State, 30 Texas Crim. App., 419.

*F. J. McCord,* Assistant Attorney-General, for the State.—On question of defendant's intent to kill: Shaw v. State, 34 Texas Crim. Rep., 435. On question of provocation: Hudson v. State, 40 Texas, 13.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of murder in the second degree, his punishment being assessed at ten years confinement in the penitentiary.

On the evening of the 8th of May, 1906, about 4 o'clock, appellant and deceased, Stanley, had a personal difficulty on the street in a little country village called Juno in Val Verde County. Appellant had just bought a small ranch containing three sections of land from Babb, and went to the store, under the control of deceased, and made a couple of purchases and borrowed $6.05 with which to pay the wages of one of his employees, Sam Williams. When he made the trade with Babb it was understood that the stock then in the pasture should remain, at least some of it, and two horses belonging to the deceased were mentioned among the stock. Appellant did not agree to pasture the two horses, and in that connection made some remark about not liking the deceased, but that although he did not like him, he would have the cheek or gall to borrow money from him. There is further evidence that appellant had been trading at the store, under control of the deceased, and on two previous occasions some words had occurred between them in regard to a settlement—one in regard to a settlement and the other in regard to some premiums that had been offered as prizes in regard to the sale of some goods that had been purchased. Babb informed the deceased of the remarks appellant had made. Deceased accosted appellant in regard to it which ended in a difficulty between them in which deceased had his knife in his hand and caught the bridle of the horse which appellant was riding and later threw a rock of considerable size at him and struck his hand. Appellant rode away remarking, "Stanley, will you wait for me two hours?" When appellant made this remark, Stanley said "All right." Williams rode away with appellant and started out in the direction of appellant's ranch house, which is some two and a half or three miles southwest of the little town of Juno. While

riding along together, this witness urged appellant to drop the matter or go to law with it and let the law take its course, and that he would be a witness through it all. Appellant replied to this, "You just keep your damn mouth shut; you will be a witness soon enough. This is not the first time Stanley has run over me, and he need not think that he can live in Juno and run over me that way." When this conversation occurred between the parties they were about three miles from the appellant's ranch. This witness rode on with the appellant until they reached the Babb pasture and there separated, witness for the purpose of driving some cattle to water, and appellant went on to the house at his ranch, changed horses, got his gun and returned to a point somewhere in the neighborhood of a half mile from Stanley's residence. The gun that he procured was what they call a 30-30 Marlin rifle. Deceased, in the meantime, had gone home, it being about sundown, and after going to the house prepared himself to do the chores around the place, and among other things to milk the cow. He and his wife went to the cowpen, which is something about 135 or 140 feet from deceased's house. Deceased was engaged in milking, and his wife was sitting near by. She observed a man coming through the pasture towards the cowpen and called her husband's attention to it, but he kept on milking, and did not heed her, and paid no attention to what she said. Again she spoke to him and he paid no attention. Finally appellant had reached a cross fence between deceased's property and one on the west, belonging to and known as the Bill West place. Mrs. Stanley's testimony at this point is as follows: "There is a road leading from the gate in front of the Bill West place up through the Bill West lot and north of his house back to his barn and the person that I saw when I first observed him was coming right along this road or pathway a little north of the Bill West house. No one was living at the Bill West house at that time. The house was vacant. Mr. West had moved out about a week before. When I first saw this person coming along this pathway I saw that he had something in his hand, but at first I did not know what it was, but I thought it was some one stealing wood and I said to Mr. Stanley, 'There is a man.' It looked as though it was some one taking something off of that place. Mr. Stanley paid no attention but went on milking and I kept on watching the party as he came on down in an eastern direction bearing towards our fence until he stopped at a place that I afterwards pointed out to Mr. Ratchford when he was there to make a map. I know where there are some small bushes in the Bill West yard; I think this person stopped along here near the fence right against the fence. He came carrying his gun in his hands and was peeping and stooping. There was a plank fence around the cowpen. Some time before this person got there to where he stopped, I discovered

that what he had was a gun. I did not know anything about my husband having had a difficulty with the defendant at that time. As he was coming along and after I could see that he had a gun I said to my husband, 'It is a gun, some one has been hunting.' I said this because I noticed it was a man with a gun and supposed he had been hunting. When the man got up there to the place where he stopped, he said to me, 'Mrs. Stanley, is John there?' And I said, 'Yes.' And then I said, 'John, there is a man that wishes to speak to you.' He went on milking and then I said, 'See what the man wants,' and then Mr. Stanley rose up from the cow. I had already gotten up before the man had gotten to the place where he stopped. I got up when I saw him bearing towards the fence, peeping and stooping. When the man spoke to me Mr. Stanley got up and stepped out from the cow towards the east with his side towards the man. Mr. Stanley was still dressed in his shirt-sleeves. When Mr. Stanley stepped out from the cow the man said, 'John, have you got your knife?' and Mr. Stanley answered 'No, I have not got it.' And then two shots were fired by Fred Franks. At the time he fired these shots he was right there in the Bill West lot near the fence. When my husband got up from the cow, he said, 'It is Fred Franks; we had a little racket this evening,' and he then immediately stepped out from the cow and the shots were fired almost instantly, one right after the other. * * * When the gun fired Mr. Stanley was standing with his hands down by his side. At the second shot he fell with his back and shoulders resting against the post, the second post on the north string of the fence, being the second post from the northeast corner of the cowpen. I did not know that he had been hit when he first fell; I saw him grab his knee when he fell; I thought he was dodging the shots." Stanley was unarmed. Immediately upon firing of the second shot and the fall of the deceased, appellant went rapidly away. As before stated, appellant had hitched his horse at seven or eight hundred yards distance from the scene of the homicide, and had gone through the pasture to the point from which he fired the shots, which was something in the neighborhood of 115 or 120 feet from the deceased. It had been the custom and habit of the deceased to milk the cow at about that time of the evening in that particular cowpen. Mrs. Stanley was the only eyewitness. The deceased lived about thirty minutes. The ball took effect immediately under and behind his knee, cutting a large artery. The first shot is supposed not to have taken effect, at least deceased was struck but once. Appellant's testimony, detailed by himself, is very voluminous, covering nearly 130 pages of the record. His voluntary statement given before the examining court was introduced by the State, and in many particular essentials was directly contradictory of his evidence on the final trial in respect to the main features of the case. It will be

useless to undertake to detail all of appellant's evidence, and it would be somewhat a difficult matter to get his evidence in an opinion without going over all of it and showing various statements, contradictions and matters of that sort, which would serve no practical purpose. As appellant relied in his brief upon certain statements made by appellant, upon his trial, and collated in the brief, it may be sufficient to state those. As to his purpose in going to Stanley's premises, under the circumstances, and at the time he did, he states: "I wanted to talk to Mr. Stanley and reason with him if I could, and tell him that he had imposed on me, and he must not do that, and I thought it would be best to go and find him away from his saloon or store. I wanted to reason with him and talk to him there away from the hurrah of the crowd. I felt that he would be more calm and would probably talk and reason with me at that place better than any other place. That is the way I felt." He also states that in going to Stanley's premises under the circumstances, that he had no intention of having any row or difficulty with Stanley or of shooting or killing him, and that his purpose in taking the gun with him was in order that he might be not unarmed in case Stanley assaulted him. He further testified that as he approached Stanley's residence he saw Mrs. Stanley in the cowpen standing near the cow and that he walked up to the fence dividing the Bill West lot from the Stanley lot, and spoke to her, and asked if Mr. Stanley was present, and that Mr. Stanley then came from behind the cow and started in a run, past her, toward the cowpen gate, in the direction of his residence. Continuing his testimony, we make the following quotation: "I says, 'Come here, Mr. Stanley,' and he didn't pay any attention to me. Then he was going towards the gate. I spoke the second time to him. I says, 'Come here, Mr. Stanley,' and I says, 'Stop,' and I couldn't tell what he was going to do, and I became excited and agitated, and I called to him the third time and asked him to stop, and he refused to stop and I fired. I aimed at least three feet in front of him, near the front gate and he didn't pay any attention. He didn't stop at all. I fired another one as he got directly in the gate. I aimed to shoot him in the leg, right about here, to stop him. I felt he was going to do me some harm. I didn't know what his intention was. I aimed to shoot him right here, to stop him." Appellant further testified that he was excited at the time; that he did not intend to hit the deceased with his first shot, but fired it merely to stop him; that he was afraid deceased wanted to shoot or kill him or to get a gun; that at the time he shot, deceased was going in the direction of his house, and he, appellant, did not know whether deceased had arms about him or not; that deceased was a strong, active man, about 30 years of age and weighed about 190 pounds, while he was in ill-health and weighed only about 144 pounds, and after the attack upon him

by Stanley in front of the saloon, he was very much afraid of
Stanley and was in a very nervous and excited condition, from
that time until the shooting occurred. From the testimony in
the record we find that after the difficulty about four o'clock ap-
pellant went to his ranch some three miles from town, changed
horses, got his Marlin rifle, returned, and hitched his horse, as
he states on this trial, about 700 yards from deceased house, and
on the examining trial about three-fourths of a mile, went through
the pasture between sundown and dark within 120 feet of the de-
ceased and called for him. Finally, deceased arose from where he
was milking his cow, and according to Mrs. Stanley's testimony,
appellant fired two shots at him, one of them proving fatal. Ac-
cording to appellant's theory at this point he went to talk to de-
ceased, and deceased started in the direction of his house as if to
get a gun, and he then shot with no intention to kill deceased but
to shoot him in the leg, or as some of the testimony puts it, shoot
off his leg. Under this state of facts appellant urged that the
court erred in not charging the law of self-defense. This case
does not come within the rule of the case of Shannon v. State,
35 Texas Crim. Rep., 2. When appellant approached deceased he
called him and told him to come there, and under the phase of
the testimony deceased did not respond but started towards his
house. This, in no sense, required the court to charge self-defense.
See Lynch v. State, 24 Texas Crim. App., 350; Bush v. State, 40
Texas Crim. Rep., 539; Courtney v. State, 57 S. W., 654; Her-
rington v. State, 63 S. W. Rep., 562.

Appellant also contends there was error in not charging the
jury with reference to appellant's intent in shooting at the deceased
which he states was not for the purpose of killing. We are of
opinion, that under the facts of the case this was not necessary.
Appellant shot for the purpose either of killing or of inflicting
serious bodily injury. He shot with a Marlin rifle at a distance of
less than forty yards, which proved fatal. If appellant shot with a
view of killing, he would be guilty of criminal homicide, or if he
shot under the circumstances, as detailed by himself, it is patent
that it was intended to inflict upon deceased serious bodily injury.
The court charged the jury that if the shot was fired for the purpose
of killing or inflicting serious bodily injury, which in its necessary
and probable consequences might result in his death, he would be
guilty, if actuated by malice, of murder in the second degree, and
in substance, if otherwise he would be guilty of manslaughter, if
his mind was at the time incapable of cool reflection.

The court submitted a charge on the theory of manslaughter.
Considerable criticism is indulged in regard to this charge, es-
pecially that part of it which instructs the jury that it must be a
sudden passion and not produced by former provocation, and cites

quite a number of authorities in support of this proposition. Many of these authorities discuss the question of insulting conduct to a female relative, when the insulting conduct did not occur in the presence of the accused. That line of cases has no bearing upon the question here. The statute requires passion and that it must be engendered by provocation, and that it must grow out of provocation at the time of the difficulty, and must not be the result of a former provocation. This is the statute and is the law until the Legislature changes it.

The court also instructed the jury in regard to cooling time that if appellant's mind was aroused to such a degree of anger, rage, sudden resentment or terror as resulted or may have resulted from the difficulty something like two hours before the shooting, to the effect that if his mind had not cooled and that it was still agitated to incapability of cool reflection by reason of that, they would give him the benefit, and find him guilty of manslaughter. There was no adequate cause occurring at the time of the difficulty, unless it is under appellant's statement that he thought deceased was going to his house 135 or 140 feet away to get a gun. This would not constitute adequate cause. Therefore, we are of the opinion that the provocation, if any existed by reading of this record, was the previous difficulty in the evening in which the deceased is said to have attacked or sought to have attacked appellant with his knife, and failing in this, threw a rock at him and struck him on the hand, which produced pain. To meet any exigencies of the case and favorable to appellant, although this difficulty was two or three hours prior to the homicide, the court gave him the benefit of that adequate cause as a basis of acquitting him of murder and convicting him of manslaughter under the theory of cooling time. This was as favorable as appellant was entitled to have the jury charged under the facts. It may be more than seriously doubted under the facts of the case, if appellant's mind was in any manner moved other than by revenge, for he testified that he was a very fine shot and that he fired the first shot three feet in front of him (deceased) in order to stop him, and failing in this, he shot him in the leg while he was moving in the direction of the house as appellant supposed to get a gun. This shows a very cool and calm condition of the mind; it occurs to us, and precludes the idea of a mind that was excited beyond the point of cool reflection.

Taking the charge as a whole, we are of opinion there is no sufficient error under our decisions to require a reversal of this judgment; and that the facts show that appellant rode three miles, changed horses, because the one he was first riding was wild, to get another horse upon which he could carry his gun, and returned to somewhere between a half and three-quarters of a mile, and went up the pathway to the pen where deceased was in the habit

of milking his cow in the evening, calling him up from behind, and shot him to death or inflicted a wound upon him from which he died in thirty minutes. Away from the issue of cooling time, the issue of manslaughter was clearly not in this case, and it may be asserted that under the later decisions of this State manslaughter was not in it from the standpoint of cooling time. There was clearly no evidence upon which to predicate a charge upon self-defense.

Finding no error in this record requiring a reversal of the judgment, it is in all things affirmed.

*Affirmed.*