## Joe Parish v. State.

### No. 2203.   Decided January 29, 1913.

**1.—Aggravated Assault—Evidence—Contradicting Witness—Malice.**

Where, upon trial of aggravated assault, the party alleged to have been injured testified that he and the defendant had always been friends and that he did not put any dough containing poison in front of defendant's house and did not poison defendant's chickens therewith, the court should have permitted defendant to show the alleged injured party did all these things, to show the malice of the State's witness.

**2.—Same—Evidence—Credibility of Witness.**

Where, upon trial of aggravated assault, the party alleged to have been injured testified that he had not been able to work, etc., and to be out and about for some time after the injury, the court should have permitted the defendant to show that the said party, the day after the difficulty, was around defendant's place armed with a gun, cursing and abusing defendant and daring him to come out and settle the difficulty.

**3.—Same—Charge of Court—Force—Self-defense.**

Where, upon trial of aggravated assault, the evidence showed that the defendant was acting in self-defense, a charge of the court curtailing the defendant's right of self-defense to the issue of more force than was necessary, etc., was reversible error; the defendant having requested proper charges on this issue of the case.

**4.—Same—Charge of Court—Weight of Evidence—Self-defense.**

Where, upon trial of aggravated assault, the evidence raised the issue of self-defense, a charge of the court eliminating such defense was reversible error.

**5.—Same—Serious Bodily Injury—Insufficiency of the Evidence.**

Where serious bodily injury was alleged as a cause of aggravation in a trial for aggravated assault, and the evidence did not show any such serious bodily injury inflicted upon the party alleged to have been injured, the conviction can not be sustained.

Appeal from the County Court of Harrison.   Tried below before the Hon. Geo. L. Huffman.

Appeal from a conviction of aggravated assault; penalty, a fine of $100 and six months confinement in the county jail.

The opinion states the case.

*Y. D. Harrison,* for appellant.—On question of the court's charge on force: Marsden v. State, 54 Tex. Crim. Rep., 70; 110 S. W. Rep., 897; Gray v. State, 55 Tex. Crim. Rep., 90; 114 S. W. Rep., 635.

On question of serious bodily injury: Wilson v. State, 15 Texas Crim. App., 150; Skidmore v. State, 43 Texas, 93; Halsell v. State, 29 Texas Crim. App., 22; Pinson v. State, 23 Texas, 579.

On question of showing malice of State's witness: Clark v. State, 28 Texas Crim. App., 189; Hunt v. State, 9 id, 166; Meyers v. State, 37 Texas Crim. Rep., 208; Taylor v. State, 56 S. W. Rep., 753.

*C. E. Lane,* Assistant Attorney-General, for the State.

DAVIDSON, Presiding Judge.—Appellant was convicted of aggravated assault and battery, his punishment being assessed at a fine of $100 and imprisonment in the county jail for six months.

As usual, in cases of this sort, the evidence is in conflict and presents divergent views to be considered by the jury under appropriate instructions of the court. The witness and alleged assaulted party, Greer, testified that he and appellant live about a mile apart and about five miles from the city of Marshall. That their farms joined, and that he owned some land directly in front of appellant's house. That on the morning of July 24, 1912, in company with his boy he went to his corn field, which was near appellant's house and across the road; they cut an arm full of corn each and started down the road in the direction of his home and met appellant. He says, "Appellant did not speak to me, but as I thought passed by." "Just after he had passed he struck him with something on the shoulder which knocked me down and rendered me unconscious." He says when he came to himself appellant was whipping him with a leather strap with a buckle on the end of it. He had torn his shirt off all but the right arm and had almost torn his breeches off. Greer says he staggered up and put his hand in his right pocket and got his knife and went to pull his trousers up and appellant slapped the knife out of his hand and shoved him over on the ground. That he continued whipping him with the leather strap until Texana Davenport and others told him he had whipped him enough and he let him go. Greer says he then got up and went down the dirt road to the railroad crossing, then took down the railroad towards home. When he came to the trestle on the railroad the morning passenger train was approaching; he ran down the dump under the trestle to hide from the passengers; that he did not desire them to see him in his condition. He further says: "I have not been able to do any work since the time this happened and am still not able to do any work." At this point he was asked to stand up before on his person, and the district attorney called attention to the wounds the jury and take off his shirt so that the jury could see the wounds and bruises on his back from his shoulders to his hips and then changed his face to the jury and pointed to his collar bone, showing a

lump where the witness said his collar bone was broken. To all of this appellant interposed objections on various grounds. On cross-examination he says that when he became conscious of surrounding circumstances he saw Lon Parish, Texana Davenport, Lucy Franklin, B. F. Turner and others present. He says he did not go a day or two before this in front of the defendant's house and scatter some material in the road and in the fence corners, and did not put anything there that had poison in it that would poison the defendant's chickens. He says that he and appellant had lived about a mile from each other, and had so lived for ten or fifteen years, and were perfectly friendly. He says, "I never have had any trouble with Joe before." He further states, "After I came to myself and after I tried to get my knife out I fought back at Joe as best I could and I don't know how long we were there fighting; it might have been twenty-five or thirty minutes. Finally Texana Davenport and Lon Parish told Joe to be ashamed of himself and go on home and let me alone, and told me to go on home and let Joe alone."

Dr. Rains testified for the State that he treated witness Greer for the wounds supposed to have been inflicted by appellant. He states that Greer's back had been lacerated considerably by some instrument and there were numerous abrasions of the skin on the back, some of which were oozing. His collarbone was broken. Quoting witness, he says: "I don't think his collarbone was broken by a blow at that point, because there was no bruise of the flesh or broken skin to show that there had been any blow." He considered the wounds serious because infection might result from the wounds. On cross-examination he says the collarbone was broken, but he was confident there was no bruises on the body at the point where the bone was broken. It could have been done from a fall or catching with his hands. The wounds on the back were not of a serious nature and such as would likely produce death or serious bodily injury. The wounds on the collarbone were not such that would likely produce death—just a broken collarbone without any bruise on the person at the point where the break was. Any wound, however slight, could start infection of the person. This is the State's case.

Appellant introduced a number of witnesses, who testified to the general reputation of the assaulted party Greer for truth and veracity as well as the general bad reputation for peace and violence in the neighborhood in which he lived, all showing that it was bad in both respects. Nancy Parish testified she was the wife of defendant and saw the difficulty between her husband and Greer and was present on that occasion. She says on the morning of the difficulty she, her husband and Lucy Franklin had gone down to the peach orchard of Geo. Davenport to gather peaches and were in the peach orchard at work when Greer came along the road with a turn of corn on his shoulder. The orchard was near the side of the road and appellant, when he saw Greer coming, went to the fence and just as he crawled under the

wire to get in the road he asked Greer why he had poisoned his chickens and says to him, "Have I done you any harm, or have my chickens been bothering you?" When appellant said this Greer threw his corn down, jerked out his knife and cursed appellant, and he said he killed his chickens and damn him he would kill him, and started at appellant with his knife open. When this happened appellant struck him on the arm with his hand and knocked the knife out of his hand, and Greer jumped towards the knife and stooped over to pick it up, and as he did this appellant shoved him down and he fell beyond the knife and appellant picked the knife up. Greer jumped up and they went to fighting. Appellant would push him off with one hand and whip him with the leather strop with the other, and this continued until Texana Davenport came and parted them. She says that appellant never struck Greer with anything except his fist and the leather strop; that he had no club or stick in his hand. When Texana Davenport got there she told them to quit, that they ought to be ashamed of themselves, and they quit fighting. Appellant went off towards his home and Greer went off down the dirt road towards the crossing. She says a day or two before the difficulty she saw Greer in front of her and appellant's residence with a bucket in his hand dropping something in the road and in the fence corners, and the next morning when she got up she found about forty of her chickens dead; they were scattered all over the place; some of Texana Davenport's turkeys also died as well as several of her chickens. She says she then went around and looked at the material Greer had dropped and saw that chickens had been eating it and scratched around it, and she picked up some of this material and carried it to the house and turned it over to appellant, her husband.

Texana Davenport testified she lives about two hundred yards of appellant. That on the morning of the difficulty she heard some loud talking and looked out of her door and saw appellant and Greer scuffling; she first thought they were just tusseling with each other, but soon discovered they were fighting, and she immediately ran to where they were. On reaching them Greer was knocking appellant with his fist and hands and appellant was knocking Greer with one hand and whipping him with a leather strop with the other. "From the time I first saw them up to the time they quit, this leather strop was all that Joe Parish used on him. I never saw him hit him with a stick or anything. When I got there they had virtually torn everything off of them and had on nothing but their pants. I told them they ought to be ashamed of themselves and to quit fighting and go home and when I said this they quit. Greer went up the road home and Joe went on home." This was all she "saw at the row." She says a day or two before this several of her chickens and eight or ten of her young turkeys died; that her chickens and turkeys died the same night that Nancy Parish's chickens died. On cross-examination she stated when she got down to where Greer and appellant were fighting they were

both standing up fighting each other. Appellant was using a leather strop on Greer which he had fastened on his arm with a string. "I told them they ought to be ashamed of themselves." She says she heard appellant say to Greer just as she reached them, "You must live a good man around here. I am just tickling you now; the next time I will whip you."

The defendant testified in his own behalf that a day or two prior to the difficulty he saw Greer in front of his house in the road with a bucket in his hand scattering some material that looked like dough. "I didn't pay any attention to that until the next day in the afternoon. Early the next morning I came to town and when I got back home my wife had forty of her chickens piled up in the yard dead and I saw some young turkeys and some of Geo. Davenport's chickens dead. I went out in the road where this stuff was and saw that the chickens had been picking in it and scratching around it and picked some of it up and brought it to town and yesterday turned it over to Mr. Matthewson and asked him to analyze it to see if it had poison in it and he promised he would do it. The day of the difficulty my wife and I and some other darkies went to George Davenport's peach orchard, which is about half way between where I live and where George lives and right on the side of the road. We were there gathering peaches and I saw Jim Greer coming along the road with a turn of green corn on his shoulder. I walked out to the road and asked him why he had poisoned my chickens and also if I had done him any harm and if the chickens were bothering him. He threw his corn down and jerked this knife (which he exhibited) and began cursing me and making towards me with the knife open and said that he killed my chickens and dam me he would kill me if I fooled with him, and made at me with a drawn knife and I slapped his arm that had the knife in it and knocked it out of his hand. The knife fell off a piece from him on the ground and he stooped to pick it up, and as he did that I shoved him over the knife and grabbed it and shut it up and put it in my pocket, and that is the way I got the knife. (Witness here produces the knife.) Greer jumped up and made at me and we went to fighting. I would push him off of me with one hand and whip him with this leather strop with the other ,and we fought there until Texana Davenport parted us. I went to the road and asked Greer this question with no intention of raising a row with him, but solely to find out if he poisoned my chickens and if they were bothering him. I had no idea of having a difficulty with him when I spoke to him. I did not meet him in the road and pass him without speaking to him as he said I did. I crawled under the wire fence coming from the peach orchard and as soon as I got out on the outside of the fence I said, 'Good morning, Mr. Greer,' and then I asked him about poisoning my chickens. I knocked the knife out of his hand to keep him from cutting me. He was making at me with it open and I thought he intended to kill me. All I ever did to him was to push him off with one hand and whip

him with this leather strop with the other. I didn't hit him on the shoulder with a club or stick as he said I did. I never thought of getting a club or a stick nor ever thought of having a row with him until he started at me with a knife. We have never had any trouble before this.'' Appellant accounted for having the leather strop by saying he found it on his way to the peach orchard and picked it up and carried it along with him.

A Mr. Sanders testified that the knife introduced in evidence had a blade about two and one-half inches long and a handle about three inches long. It was an instrument with which one man could kill another and might be a dangerous weapon. The strop introduced in evidence was leather and about two and one-half feet long and two inches wide and something like an eighth of an inch thick. This is substantially the evidence introduced on the trial.

The first bill of exceptions recites that while appellant was on the stand testifying in his own behalf, he stated that a few days prior to the difficulty he saw Greer out in the road in front of his house with a bucket in his hand dropping something in the road and in the fence corners; that the next morning after this was done he noticed his chickens and found forty dead. That not only had his chickens died, but his neighbors' chickens had also died. That he went out in the road and fence corners and saw some material which resembled dough lying on the ground and noticed that the chickens had been eating and scratching around in it. He was then asked if he knew what caused his chickens to die and what, if anything, was mixed up in the dough. Witness would have answered, had he been permitted to do so, that they died from eating the material that the witness Greer placed in front of his house and that said material contained poison that killed the chickens, but the kind of poison he was unable to state. The State objected to this on various grounds, which we deem unnecessary to state, and the court sustained the objections. Appellant offered this testimony to show malice of the witness Greer toward defendant and to contradict the witness' statement on the stand wherein he testified that he and the defendant had always been friends, and that he did not put any dough containing poison in front of the defendant's house and did not poison his chickens at the time referred to in this bill of exceptions. For the purpose for which this testimony was offered, it should have been permitted to go to the jury. It is unnecessary to elaborate the reasons why this is so. The witness Greer having testified that his feelings had always been friendly towards appellant and their relations had always been friendly, and that he had no ill-feeling, etc., towards him, this testimony, we think, should have been permitted to go to the jury.

The second bill of exceptions recites that the same testimony was offered through the witness Nancy Parish, wife of appellant, and rejected. The objections of the State, and the purpose for which offered by defendant, are the same as in the previous bill.

Another bill, after reciting the matters and things with reference to Greer going in the road and fence corners and scattering dough and material about appellant's house from which his chickens died, shows that appellant offered to prove by witnesses that the day after the difficulty they saw Greer, his wife and son in front of appellant's place in the road near the gate, Greer being armed with a gun, and he cursed and abused defendant, and called him to come out of his house and let them settle it; told the defendant that he was afraid to come, and while the witness Greer was standing in front of his gate, cursing and abusing defendant, Greer's son went into the stable of the defendant and deposited some material in both of his mule troughs just like the witness Greer had deposited in the road, which defendant's chickens ate and which killed the chickens, and this material contained poison and it was put in the troughs for the purpose of poisoning the defendant's mules. This was excluded on objection of the State. The same matters were set forth in another bill of exceptions by the witness Nancy Parish. This was offered for several purposes, one of which was to contradict Greer to the effect that he was unable to get about, was confined about the house, and unable to work, etc., for some time, and even up to the time he testified in the case. We think this testimony was admissible, if Greer had gone to the house of appellant as the witnesses state the day following the difficulty alleged in the information, to meet and contradict Greer that he was not able to be about. This would show that he was able to get out, and that he was armed and carried his gun, and went to appellant's house for the purpose of settling the difficulty with guns with appellant.

There are various objections to the charge given by the court and refusal of charges asked by appellant submitting the different theories of the case. It is hardly necessary to take them up seriatim, as we think they can be disposed of in a general way. The court charged the jury as follows:

"In this case defendant has introduced evidence tending to show self-defense. You are instructed that every person is permitted by law to defend himself against any act of unlawful violence offered to his person, but in exercising this right of self-defense he is only permitted to use such degree of violence as is reasonably necessary to prevent or protect himself against such unlawful violence.

"Now if you believe from the evidence that the defendant, in inflicting the injury upon the said Jim Greer as charged in the information, acted in his own necessary self-defense, against an assault made by said Jim Greer upon him, or to prevent such assault, and that he did not use greater force than was necessary to prevent such assault, then you will find defendant not guilty."

This charge was not the law of this case, and was clearly erroneous. The question has been frequently decided by this court, that charges

of this character in cases of this sort are clearly erroneous. In the case of Marsden v. State, 53 Texas Crim. Rep., 458, this charge was expressly condemned and the judgment reversed alone for its being given the jury. Appellant requested instructions submitting the law of self-defense, which were refused by the court. All these matters are properly presented for adjudication. It may be necessary to set out two of the charges asked by appellant:

"Now if you believe from the evidence, on or about the 24th day of July, 1912, the defendant Joe Parish, believing that the said Jim Greer had poisoned his chickens, and in order to find out who poisoned said chickens, asked the witness Jim Greer if he poisoned his (Parish's) chickens, with no intent on the part of him, the said Joe Parish, to raise a difficulty with him, the witness Greer, and the witness Greer upon being asked the question, started at the defendant (Parish) with his knife and the defendant believed from the words of the witness Greer, coupled with his acts or either of them, that the witness Greer intended to make an assault with his fist or with the knife upon the person of the defendant, then the defendant had the right to defend himself against the witness Jim Greer from hitting him, the defendant, or cutting him with his knife."

He also asked this charge: "The defendant in this case has a right to do anything necessary to protect his property or person from being injured by Jim Greer or any other person, and if you believe beyond a reasonable doubt from the evidence in this case that the witness Greer made an assault or attempted to assault the defendant either with his person or his knife, and the defendant believed from the statements in evidence before you that the said Greer was about to assault him with his knife and his person, or either of them, then the defendant Joe Parish had a right to defend himself against any attack made by the said Greer, and if you believe from the evidence the witness Greer made an attack upon the defendant and the defendant repelled that attack, you will acquit the defendant."

This was also refused. These are mentioned in order to show that the court erred in giving the charge he did in limiting appellant's right of self-defense to the issue of more force than was necessary and curtailing his right of self-defense and the action on the part of appellant seeking to correct that and have the law properly presented covering his side of the case. Appellant had the right to approach and ask Greer if he had poisoned his chickens and why, and if this was done with no purpose of bringing on a difficulty, his right of self-defense would be perfect. This question was thoroughly adjudicated in Shannon v. State, 35 Texas Crim. Rep., 2, which case has been followed undeviatingly to date. It is also the law that if Greer made the attack or attempted to make it with a knife, appellant certainly had the right to protect himself without being burdened with the doctrine of unnecessary force. If unnecessary force enters into a case,

the law applicable thereto may be given in charge to the jury, but where the right of self-defense comes as in this case then such charge on unnecessary force is not requisite or permissible.

The court gave another charge, to which objections are urged, as follows: "I instruct you that you may consider the testimony of the witnesses, Nancy Parish, Texana Davenport and Joe Parish, with reference to the substance being deposited in the road and upon the premises of Joe Parish and the loss of chickens by defendant, for no purpose other than as mitigation of punishment in the event you find defendant guilty." It is little difficult to perceive upon what theory this charge was given or why such limitation should be placed upon the evidence. This evidence was the central point of the case; it was the occasion for the entire difficulty. Under this charge the jury was instructed in effect that appellant approached Greer and whipped him because he had poisoned his chickens. This was an assumption on the part of the court, so far as this charge is concerned, that appellant was the aggressive party and whipped Greer because of that fact. The issues in the case were strongly and sharply contested by the evidence that Greer was the attacking party and not appellant. By this charge all idea of self-defense on the part of the defendant was clearly eliminated. Other reasons might be given why this charge is not the law of this case, and it was clearly a charge on the weight of the evidence, but we have said enough without going further into detail.

The complaint and information charge appellant, as grounds of committing the aggravated assault, with inflicting serious bodily injury. Without reviewing the testimony, it is sufficient to state that the doctors who examined Greer testified that the injuries were not of a serious nature otherwise than they might be subject to infection and his testimony shows that the collarbone was not broken by means of the strap, for there was no bruise at that point. In fact, there is no testimony, as we understand this record, which would show the collarbone was broken by the use of the strap. How it was broken is not shown, and it may be questioned whether it was broken in the difficulty at all. But be that as it may, if the doctor's testimony is to be the criterion, the State has not made out a case of serious bodily injury. There were bruises on the body of Greer inflicted by the leather strap, but the prosecution did not charge appellant with an aggravated assault by the use or means of an instrument that would inflict disgrace; it was charged and relied only and solely that serious bodily injury was inflicted. We are of opinion, under the numerous authorities, this evidence does not show serious bodily injury.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*