C. Q. STANLEY v. THE STATE.

No. 4352.   Decided March 7, 1917.

**1.—Murder—Provoking Difficulty—Self-defense—Charge of Court.**

Where, upon trial of murder, the evidence showed that the defendant had declined to give deceased permission to occupy one of his tenant houses, and that the deceased had made a declaration that he was going to move into said house as soon as the occupant moved out, and that he had an instrument there which would prevent defendant from putting him out, etc., and that the defendant on the day of the homicide carried his gun upon his premises to ascertain whether deceased had moved into or was about to move into said house, etc.,

the court should have submitted defendant's requested charge on that phase of the case inasmuch as the court had submitted a charge on the issue of provoking the difficulty. Following Shannon v. State, 35 Texas Crim. Rep., 2, and other cases.

### 2.—Same—Rule Stated—Self-defense—Provoking Difficulty—Explanation.

When the issue of self-defense is raised and the court in submitting it restricts it by submitting the issue of provoking the difficulty, the law requires to also instruct the jury that defendant arming himself and seeking the deceased for the purpose of explanation does not deprive him of his right of self-defense. Following Fox v. State, 71 Texas Crim. Rep., 318, and other cases.

### 3.—Same—Singling out Facts—Verbal Provocation—Charge of Court.

Where the court's charge on provoking the difficulty in connection with self-defense limited defendant's right thereto by singling out the verbal provocation which occurred just before the shooting, ignoring the testimony, showing a hostile demonstration accompanying the words of the deceased, and failing to submit the converse of the proposition, that is, defendant's right to shoot if the deceased did threatening acts, etc., at the time, the same was reversible error. Following Lundy v. State, 59 Texas Crim. Rep., 131.

### 4.—Same—Evidence—Opinion of Witness.

Where, upon trial of murder, defendant's testimony showed that he was informed that the deceased possessed a certain instrument by which he would prevent the defendant from putting him out of one of his tenant houses after he once moved in, testimony of the interpretation by the witness of the language used by the deceased as to the harmless character of such instrument, was inadmissible, the evidence showing that no such inference was communicated to defendant, but that the information he received led him to believe the contrary. Following Green v. State, 49 Texas Crim. Rep., 238.

### 5.—Same—Evidence—Immateriality of Testimony.

Upon trial of murder testimony that one of defendant's witnesses had failed to attend his wife's funeral should have been excluded, although it may not have been of sufficient importance to have required a reversal.

### 6.—Same—Continuance—Practice on Appeal.

Where the judgment is reversed and the cause remanded upon other grounds, the overruling of the application for a continuance need not be considered.

Appeal from the District Court of Smith. Tried below before the Hon. R. M. Smith.

Appeal from a conviction of murder; penalty, seventeen years imprisonment in the penitentiary.

The opinion states the case.

*F. V. Hughes* and *Jas. M. Edwards,* for appellant.—On question of opinion of witness: Dowell v. State, 58 Texas Crim. Rep., 482, 126 S. W. Rep., 871; Martin v. State, 42 Texas Crim. Rep., 144, 58 S. W. Rep., 112; Barnard v. State, 73 S. W. Rep., 957; Hardin v. State, 40 Texas Crim. Rep., 208, 49 S. W. Rep., 607; Clay v. State, 41 Texas Crim. Rep., 653, 56 S. W. Rep., 629; McClure v. State, 53 S. W. Rep., 111; Funderburk v. State, 64 S. W. Rep., 1059; Green v. State, 49 Texas Crim. Rep., 238, 90 S. W. Rep., 1115.

Upon question that defendant's witness did not attend his wife's funeral: Faulkner v. State, 80 Texas Crim. Rep., 341, 189 S. W. Rep.,

1077; Bullington v. State, 78 Texas Crim. Rep., 187, 180 S. W. Rep., 679; Shed v. State, 153 S. W. Rep., 125; Wyatt v. State, 124 S. W. Rep., 929.

On question of court's charge on self-defense and provoking difficulty: Lundy v. State, 59 Texas Crim. Rep., 131, 127 S. W. Rep., 1032; Pratt v. State, 59 Texas Crim. Rep., 635, 129 S. W. Rep., 364; Alexander v. State, 63 Texas Crim. Rep., 102, 138 S. W. Rep., 721; Welch v. State, 57 Texas Crim. Rep., 111, 122 S. W. Rep., 880; Foster v. State, 11 Texas Crim. App., 105; Jordan v. State, 11 id., 435; Hill v. State, 10 id., 618; Stevenson v. State, 17 id., 618; Kendall v. State, 8 id., 569; Gonzales v. State, 30 Texas Crim. App., 203, 16 S. W. Rep., 978.

On question of provoking difficulty and self-defense: Lake v. State, 79 Texas Crim. Rep., 234, 184 S. W. Rep., 213; Humphrey v. State, 165 S. W. Rep., 589; Thomas v. State, 71 Texas Crim. Rep., 387, 160 S. W. Rep., 71; Burnet v. State, 51 Texas Crim. Rep., 20, 100 S. W. Rep., 381; Wilson v. State, 46 Texas Crim. Rep., 523, 81 S. W. Rep., 34; Pollard v. State, 73 S. W. Rep., 953; McCandless v. State, 42 Texas Crim. Rep., 58, 57 S. W. Rep., 672; Wilson v. State, 36 S. W. Rep., 587; Gilcrease v. State, 33 Texas Crim. Rep., 619, 28 S. W. Rep., 531; Airhart v. State, 40 Texas Crim. Rep., 470, 51 S. W. Rep., 214; Hjeronynus v. State, 46 Texas Crim. Rep., 157, 79 S. W. Rep., 313; Best v. State, 58 Texas Crim. Rep., 327, 125 S. W. Rep., 909.

On question of asking explanation in connection with self-defense did not forfeit defendant's right: Mason v. State, 29 Texas Crim. App., 24; Ballard v. State, 62 Texas Crim. Rep., 435, 138 S. W. Rep., 120; Newman v. State, 69 S. W. Rep., 519; Milrainey v. State, 33 Texas Crim. Rep., 577, 28 S. W. Rep., 537; McGlouthlin v. State, 53 S. W. Rep., 872; Fox v. State, 71 Texas Crim. Rep., 318, 158 S. W. Rep., 1141.

*E. B. Hendricks,* Assistant Attorney General, for the State.

MORROW, JUDGE.—Indicted for the murder of Thurston Bobbitt, appellant was convicted, the jury fixing his punishment at confinement in the penitentiary for seventeen years.

Appellant owned a farm upon which there was located besides his dwelling a tenant house, which up to a few days before the homicide was occupied by appellant's son, D. H. Stanley, and his family. Forrest Owens owned an adjoining farm and kept a store, which was situated about 300 yards south from appellant's tenant house. The deceased for some two months prior to the homicide lived in a covered wagon which stood near Owens' premises. There was evidence that on three several occasions deceased had approached appellant upon the subject of occupying his tenant house as soon as appellant's son, D. H. Stanley, should vacate it. Appellant on each occasion had declined to give

deceased permission to occupy his house. A few days before the house was vacated deceased stated to Dale, a witness, that he had tried to rent the tenant house two or three times from Mr. Stanley; that Stanley would not let him have it but that he (deceased) was going to move in the house as soon as Dave Stanley moved out, and that it would take six months to get him out by law, and added: "I have got a $25 instrument there, and he can not. put me out by himself." At the time deceased made this statement he pointed to a box sixteen or eighteen inches square which he had in his possession. Appellant was informed of this conversation about a week before the homicide. Early in the afternoon of the day before the homicide deceased moved his wagon from the Owens' premises to an open space on appellant's land in front of the tenant house. Appellant saw the wagon there on the same afternoon and learned from Owens that it was deceased's wagon. There was testimony that appellant had been informed that Mrs. Owens had said that the deceased had tried to get her children to steal for him.

On the morning following the removal of deceased's wagon to appellant's premises the homicide took place. The only eyewitnesses were the appellant and the wife of the deceased.

Mrs. Bobbitt testified that she and her husband were in the wagon and saw appellant coming across the field from the direction of the house in which a negro by the name of Jim Mitchell lived. "When he got up to the wagon he just spoke to us like he had been doing. When he spoke to us my husband and I were getting out of the wagon, and when I got out he spoke to me. He stopped about midways of the wagon from the front to the back end. The first thing that was said was just 'Good morning.' I do not remember who spoke first, but Mr. Stanley just said, 'Good morning, Mr. Bobbitt; good morning, Mrs. Bobbitt,' and we just said, 'Good moning, Mr. Stanley,' at the time my husband was getting out of the wagon. When my husband got out he put his hands in his front pants pocket. I don't know that I could say exactly the first thing that was said either by my husband or Mr. Stanley after my husband got out of the wagon, but Mr. Stanley said that he did not want nobody around that would steal. My husband told him that he did not steal. He said that was not the way he was making his living—stealing. He said he worked for his money and bought what he wanted. He said he just moved up there on account of Forrest Owens wouldn't let him stay; that Jim Mitchell had promised him a team to move down to another house next morning; that it was raining, and he couldn't go any further. Mr. Stanley said that Forrest Owens' boy had been stealing money and things out of the store and giving it to my husband. My husband said he did not do it. He said he had never seen nothing that had been got out of the store and no money neither. Mr. Stanley said that Rice Owens told Dave Stanley that he had been stealing money and giving it to Thurston. When Mr. Stanley said that my husband replied that he never give him no money. Mr. Stanley said: 'Do you say that my boy lied?' or

'Don't you say that my boy lied,' and at that time he shot.  When Mr. Stanley said, 'Don't you say my boy lied,' my husband did not make any reply to that.  He never said nothing else, only when Mr. Stanley said, 'Don't you say that my boy lied,' he said: 'I didn't say your boy lied.  I said that Forrest's boy done the lying,' and then the killing took place.  During all this conversation my husband's hands were in his pockets; both of his hands were in his front pockets.  At the time Mr. Stanley shot, my husband's hands were in his pockets, and he never made a move to take them out."

There was testimony that the deceased had a pocketknife but no other arms.

Appellant testified that he was in the habit of carrying his gun loaded with No. 4 shot; that he took it with him to work during the fall of the year to shoot birds and rabbits; that on the morning of the homicide he started to Jim Mitchell's house about a business transaction, taking his gun with him to hunt on the way; that finding that Mitchell had gone to Tyler and observing the wagon still in front of his tenant house and having some fodder and feed stuff, peas, on the premises and some collards in the garden he concluded to go and see what was going on.  He said: "When I got up in front, I just said, 'Good morning, Mr. Bobbitt, Mrs. Bobbitt.'  They were in the wagon, and I spoke as I went around the end of the tongue.  I passed on the right hand side between the wagon and my wire fence, and when we spoke I just said: 'Well, it looks like, Mr. Bobbitt, you intrude on me anyhow.'  He gave me no answer, and I made a few steps towards the front gate of my yard and toward the back end of the wagon.  As I got about to the hind wheel he got out of the wagon, and hit his feet against something—caused me to turn.  He was coming right back of me, and when I turned he stopped, some seven or eight feet from me."  (Appellant indicated that he was carrying his gun with the muzzle down on account of the rain.)  "I said: 'Mr. Bobbitt, I will give you my whys that I don't want to be bothered.  It may be a lie or it may be the truth, but Mrs. Owens told my wife that you and your wife put her children up to stealing from them, and I don't care about being bothered with any such beings,' and I reckon it made him mad.  He run his hand down in his pocket, and I could see he looked awful vengeousness, and when he done that he started with his hand sort of worked up, and he just said: 'You are a God damned lying son-of-a-bitch,' and he run his hand in like he was going to come out with a weapon in his hand.  I thought he was going to shoot me or cut me to pieces.  I thought about the $25 instrument.  I didn't know, so I just throwed myself like I showed you a while ago, just throwed my gun.  I thought about it all together—I didn't know what he had—and fired.  Mrs. Bobbitt was in the wagon, had not gotten out at the time when I fired."

The court submitted the issues of manslaughter and self-defense as well as murder and also submitted the issue of provoking the difficulty, and of the latter complaint is made by proper and timely exceptions

upon the ground that the evidence failed to raise that issue. The four-
teenth paragraph of the court's charge followed that submitting the
issue of provoking the difficulty, and we quote it, as follows:

"But you are further instructed that no assault or homicide is jus-
tified by any merely verbal provocation; and so in this case if you find
from the evidence beyond a reasonable doubt that the defendant shot
and killed deceased merely because of verbal provocation given to him
by the deceased, if any you find there was, then if such killing was
upon the malice aforethought of the defendant, he would be guilty of
murder, and if such killing was committed by defendant under the
immediate influence of sudden passion arising from an adequate cause
rendering his mind incapable of cool reflection, as hereinbefore ex-
plained, he would be guilty of manslaughter."

Objection to the paragraph quoted was also properly made, and the
appellant requested, and the court refused, the following special charge:

"The court instructs you that, if on the occasion of the killing the
defendant apprehended that the deceased might move into his vacant
house, the defendant had the right to pass the front of deceased's wagon,
and carry his gun, and go upon his premises where the killing occurred
to ascertain whether the deceased had moved into said vacant house
or seemed about to do so, and the mere fact that he did so, if you
believe from the evidence that he did, would not impair or affect his
right of self-defense as against the deceased."

The issue of provoking the difficulty was raised. Having qualified
the appellant's right to act in self-defense, we think the court was in
error in failing to inform the jury as to the law with reference to
appellant's right to arm himself, particularly in view of the fact that
appellant had undertaken to explain the possession of his gun at the
time of the homicide, and we think that this would have been accom-
plished by reading to the jury appellant's special charge quoted above,
and that its refusal was error, requiring the reversal of the case.

It is said in Fox's case, 71 Texas Crim. Rep., 318, 158 S. W. Rep.,
1141, that when the issue of self-defense is raised and the court in sub-
mitting it restricts it by submitting the issue of provoking the difficulty,
the law of this State undoubtedly requires the court to also inform the
jury that appellant's arming himself and seeking the deceased for the
purpose of explanation will not deprive him of his right of self-defense.
The same rule is applied in Mason's case, 79 Texas Crim. Rep., 169,
183 S. W. Rep., 1153, and in Shannon's case, 35 Texas Crim. Rep., 2;
Melton's case, 47 Texas Crim. Rep., 451. The cases are numerous in
this State holding that such a charge is required where the issue of
self-defense is raised and is limited by a charge on provoking the dif-
ficulty. Branch's Crim. Law, sec. 466, and cases cited; Branch's Ann.
P. C., p. 1091, and cases cited.

The fourteenth paragraph of the charge, quoted above, further limits
appellant's right of self-defense. It singles out the verbal provocation,
ignoring the testimony showing a hostile demonstration accompanying

the words of deceased (Craiger v. State, 48 Texas Crim. Rep., 500), and is further defective in the particular that it fails to submit the converse of the proposition contained in it, viz., appellant's right to shoot if the deceased did threatening acts as well as using provoking words indicating that he was in danger of death or serious bodily harm. Lundy v. State, 59 Texas Crim. Rep., 131. It is not attacked upon this ground, but it should not be given in the form quoted on another trial.

Complaint is made of the action of the court in permitting the witness Dale, over appellant's objection, to testify on the witness stand to his interpretation of the language used by deceased and quoted hereinabove, wherein he referred to a $25 instrument. Dale testified that he inferred from the statements of the deceased that he meant to put up as a pawn the instrument contained in the box. The statement made by the deceased was communicated to appellant without information as to the inference that Dale drew from it. Appellant testifies that this information was in his mind at the time of the homicide in connection with the demonstration which he claimed that the deceased made. We think this testimony was inadmissible and probably harmful to the appellant. Branch's Ann. P. C., pp. 1080-1081; Green v. State, 49 Texas Crim. Rep., 238, 90 S. W. Rep., 1115; Martin v. State, 42 Texas Crim. Rep., 144, 58 S. W. Rep., 112.

While we can not say that the admission of the evidence that appellant's witness Owens had failed to attend his wife's funeral was of sufficient importance to require a reversal of the case, it should, on another trial, be excluded.

The assignment relating to the application for a continuance refers to matters which will not arise on another trial. The other assignments have been considered but do not present reversible error.

For the reasons hereinabove indicated, the judgment of the lower court is reversed and the cause remanded.

*Reversed and remanded.*