## WILL HENRY ECHOLS *v.* STATE.

[55 South. 485.]

1. HOMICIDE.  *Provocation of difficulty.  Uncommunicated threats.*

A father who learns of the seduction of his daughter has the right to
. seek the seducer for an explanation and for a peaceful adjustment
of the matter; and in seeking this end, he has the further right to
arm himself, not with the intention to provoke a difficulty, but to
protect himself if necessary, in self-defense.

2. UNCOMMUNICATED THREATS.  *Evidence.*

Uncommunicated threats are admissible on the trial of a criminal case
when there is a conflict in the testimony as to who was the ag-
gressor, where they throw light on the significance of the acts of
the deceased.

5. CONDITIONAL THREATS.

On the trial of a homicide case conditional threats of deceased are
admissible, where the condition of the threats of deceased had
materialized.

APPEAL from the circuit court of Tate county.

HON. L. F. RAINWATER, Judge.

Will Henry Echols was convicted of murder and ap-
peals.

The facts are fully stated in the opinion of the court.

*J. F. Dean,* for appellant.

The court erred in refusing instruction "No. 1 re-
fused" as requested by appellant. The theory and the
argument of the state was that appellant learned of the
seduction of his daughter; that he at once armed himself,
sought defendant for the purpose of killing him, pro-
voked the difficulty by the very fact of the carrying of
the weapon, and did kill him. This instruction states
the law as asked; that he had the right to arm himself
and seek the interview and that carrying the weapon was

of itself no provocation. It meets their argument by a sound proposition of law. If it is the law, appellant was entitled to it and it is reversible error to refuse it. *Patterson* v. *State,* 75 Miss. 670.

"A man who is told by his wife of insulting conduct by a third person towards her has a right to seek for an explanation and to ask a retraction, and in so doing he has the right to arm himself to resist any anticipated attack." 83 S. W. (Tex. Crim. App.) 822; *Allison* v. *U. S.,* 160 U. S. 203, 40 L. Ed. 395.

The refusal of the next instruction will be argued with the rejection of the evidence upon which it was based, which constitutes the next assignment of error. If the court was right in excluding all evidence of threats, then it was right in refusing an instruction predicated upon threats, but the converse is true. If the evidence as to threats made by deceased against appellant should have been admitted, then the instruction should have been given.

Appellant testified that his daughter Etta said "Pointelle told her he would kill her if she said anything about it, and if I said anything to him about it he would kill me." This on the objection of the state was excluded from the jury. Mose Faulkner testified Pointelle said to him in the presence of his wife, "If he, Will Henry, ever fooled with me, I am going to kill him." Anna Faulkner testified that three or four days before Christmas Pointelle said to her, "If Will Henry ever fooled with him that he was going to kill him." Both of these statements were excluded by the court upon the objection of the state over the protest of the defendant.

It is impossible to conceive upon what ground the court excluded all threats, communicated or uncommunicated. It could not have been because no overt act on the part of deceased was shown, because if defendant's testimony is to be believed, he acted solely in self-defense and was entitled to an acquittal. In fact, the court recog-

nized this and instructed the jury fully as to defendant's right of self-defense; his right to anticipate the attack of his adversary and his right to stand his ground, if he was not the aggressor; yet when he offered evidence of threats recently made by the deceased against him directly to show to the jury which was the probable aggressor, the court promptly excluded the evidence.

It could not have been because the language used did not import a threat. "Language to be competent as a threat need not be a direct statement of an intention to inflict an injury, but may threaten indirectly, by way or inference or inuendo. It is sufficient if the statement indicate a contemplation of some hostility or violence, and the fact that it is susceptible of an innocent construction does not serve to exclude it. Threats are not inadmissible merely because conditional, but under some circumstances the conditions must be shown to have been met. 6 Ency. Ev., p. 638 and notes. In *Keener's case,* 18 Ga. 194, referred to and approved by this court in *Johnson* v. *State,* 54 Miss. 430, the threats were that he had made him leave the brothel two or three times and that if he ever crossed his path he would kill him. This was held to be a threat and admissible. A threat that a saloon keeper must stop selling liquor or lose his life, or that he, the threatener would lose his, is competent evidence upon the trial of the saloon keeper for killing the threatener. *Duke* v. *State* (Ind.), 71 Am Dec. 370.

Admit that the threats were conditional, "If he speaks to me about it, I will kill him, too." "If he tackles me about it, I will kill him." "If he fools with me, I will kill him." When these expressions were used Pointelle knew the cruel wrong he had committed against appellant. He knew that when that wrong was discovered that Will Henry would most probably "speak to him about it," "tackle him about it," or "fool with him about it." On the fatal morning his guilty conscience made him

afraid to meet the man he had wronged. The conditions were met; Will Henry was there to speak to him about his great wrong. He was there to tackle him to know why it was so, and what reparation he proposed to make. He was there to fool with him as the outraged and indignant father of his seduced daughter, and according to the testimony of the defendant, Pointelle then attempted to carry his threats into execution. He had been spoken to about it; he had been tackled about it. Will Henry had hunted him up and attempted to fool with him about it, or to discuss the matter with him and he had attempted to make good his threat by trying to kill Will Henry. So the fact that the threats are conditional, or in a conditional form, can make no difference in this case. They are admissible and their weight is for the jury. In *Harris's case*, 72 Miss. 99, evidence of threats and instructions thereon were excluded. This court said, "We cannot weigh the testimony offered in the light of the charges refused or the testimony detailed above in the light of these charges, supposing them to have been given. It was for the jury to say with this testimony in and these instructions given, what credit they would give defendant's witnesses and theory." And the cause was reversed. In *Watson's case*, 81 Miss. 700, the evidence of threats was admitted in the absence of the witness, but the cause was reversed because the vital importance of the testimony and the defendant's right to have his witnesses present before the jury.

"Uncommunicated threats are admissible when there is a reasonable doubt who was the aggressor; where they throw light on the significance of the acts of the deceased." *Sinclair* v. *State*, 87 Miss. 330; *Johnson* v. *State*, 54 Miss. 430. In the last case the doctrine is fully discussed.

"The court will reverse for refusal to admit threats if the record is doubtful or the evidence conflicting." *Holly* v. *State*, 55 Miss. 424; *Hendrick* v. *State*, 55 Miss.

436; *Spivy v. State,* 58 Miss. 858; *Guice* v. *State,* 60 Miss. 714.

I call the court's special attention to *Hawthorne* v. *State,* 61 Miss. 749, which is directly in point and decisive of this case.

"Evidence of uncommunicated threats are admissible where there is doubt as to who begun the difficulty. Who is the aggressor is doubtful where there is conflict in the testimony." *Johnson* v. *State,* 66 Miss. 189; *Bell* v. *State,* 66 Miss. 192; *Wiggins* v. *U. S.,* 93 U. S. 465; *Allison* v. *U. S.,* 40 Law Ed. 395.

*M. H. Thompson,* for appellee.

Counsel for appellant complains of the refusal of the trial judge refusing to give instruction marked number "11."

Everything asked for in this instruction was given by the court in the instruction just above referred to. Counsel complains that the court refused to give this instruction stating that appellant had a right to carry his rifle with him to use, if necessary, in his self-defense. The instruction above quoted instructs the jury on this very point, saying that if he, defendant, had his rifle with him and used it in defending himself, he was not guilty. Then, if this part of the case had been covered by an instruction, it was clearly the right of the court to refuse another instruction on the same point.

The main attack of counsel for appellant on the record in this case is the exclusion of certain alleged threats made by the deceased against the appellant, by the trial judge.

In the testimony of Anna Faulkner, a daughter of appellant, is found this statement, "I saw Pointelle at my house three or four days before Christmas and he said, if he was to fool with him, he was going to kill him." The court sustained an objection by counsel for the state to the introduction of this testimony and excluded it

from the consideration of the jury. There is no contention on the part of counsel for appellant that this threat, if one, was communicated to the defendant. It is conditional, if he fools with me, I will kill him, then we have at best an uncommunicated, conditional threat. I submit that this was only a statement that the deceased was going to defend himself, if attacked by the appellant. Appellant himself says that he carried his rifle with him at all times; he also says that he had ordered the deceased to leave his, appellant's home, and admits having had a difficulty with the deceased and that he had not seen him any more until the morning of the killing, bad blood, mad, carrying his rifle all the time; in view of this state of affairs, we submit that the only reasonable construction to be put on the statement of deceased is that he intended to defend himself if appellant attacked him.

The deceased did have reason, from the acts and statement of appellant, that would give him, deceased, an apprehension that he might be attacked by the appellant, and his statement was equivalent to saying I am going to defend myself.

Uncommunicated threats were first declared admissible as evidence in this state in *Johnson* v. *State,* 54 Miss. 430. In this case the court said: "Where the testimony leaves it doubtful which was the aggressor, recent threats of the deceased against the accused, although never communicated to the latter, are admissible as tending to show the character of the killing." Also, "They will be excluded where living witnesses negative any assault by the deceased." Can the court say, after a careful examination of this record, that the deceased made any assault on the appellant? A perusal of this record shows that the appellant armed himself with a Winchester rifle, sought the deceased at his, deceased's home and when deceased told appellant that he was afraid to come out on a man who had his gun, said,

"Come on, I am here with my gun because I carry it with me all the time." Deceased starts out of the room, passing by his own gun lying on the bed, and opens the door of the room. In the meantime appellant has gotten off his mule, crossed the yard and stepped up into the open passage in front of the deceased's room, carrying his rifle with him. The deceased expected to find him on his mule out at the yard gate, but here just as he, deceased, opens the door, finds appellant in it with his drawn or extended rifle. Just at this point, the evidence for the state and defendant conflict, or the statement of appellant and the witnesses for the state cross slightly. Appellant says that the deceased grabbed the rifle; witnesses for the state say that the deceased grabbed the rifle after appellant had shot. Taking appellant's statement as true, upon which counsel for appellant attempts to predicate the competency of the alleged threats; appellant stating that deceased grabbed the rifle after opening the door and finding me, appellant, standing in the door with the rifle in my hands. Appellant says that he had just learned that morning that deceased had seduced his daughter; that he was mad; that this was his second trip over there to see deceased that morning; and when deceased opened the door and saw appellant standing there with his rifle, the mad expression on his face, expecting to find appellant outside the yard, under the circumstances, what is the only reasonable theory of his, deceased, grabbing the rifle barrel? Upon the answer to this question by the court, I am willing to rest the results of the case, if the court believes the deceased was making an assault upon the appellant, that the deceased was the aggressor by this grabbing of the rifle barrel, then the alleged threats are competent and should have been allowed as evidence. The only reasonable inference that can be drawn from this testimony is that deceased was only protecting himself from the premeditated assault of appellant. Does this testimony,

99 Miss.—44

and the only testimony of deceased grabbing the gun before the first shot was fired by appellant himself, leave any doubt as to whom was the aggressor? And unless it does, the threats are not competent. *Johnson* v. *State*, 54 Miss. 430.

The appellant says in his testimony, "The last shot I fired was when the deceased was turning around, with his hand raised and extended outwards and open." The first two shots appellant claims were accidental; yet the deceased was shot five times, and there is no proof that deceased had a weapon of any nature. The appellant says he observed no weapon on the deceased. In *Johnson* v. *State*, 66 Miss. 189, the court said: "Evidence of previous uncommunicated threats is admissible in cases where it is doubtful who began the difficulty, as tending to solve the doubt." Also, "such evidence is also admissible when it is clearly shown that the deceased, and not the accused, was the aggressor."

In 61 Miss. 749, the court says that there must be some overt act on the part of the deceased. This act must show an intention of carrying into effect the threats; it must be hostile.

In *Sinclair* v. *State*, 87 Miss. 330, which case counsel for appellant cites, both contestants drew a pistol. There was evidence to show that deceased was the aggressor and the court said, "In cases of doubt as to who the aggressor was, uncommunicated threats are competent."

Argued orally by *F. F. Dean*, for appellant, and *Jas. R. McDowell*, assistant attorney-general, for appellee.

McLAIN, C.

Will Henry Echols, the appellant, was convicted of murder in the circuit court of Tate county and sentenced to the penitentiary for life. From this judgment he appeals to this court.

The record discloses that he was a negro man, about sixty years old, and had a family consisting of a wife

and twelve children.  He was a thrifty, honest, and peaceable citizen, possessing the confidence and respect of all. His good character was abundantly testified to by his white neighbors, as well as those of his own race.  No finer example of honorable and worthy citizenship could have been shown or selected from his race.  Pointelle Echols, commonly called Shoat Echols, was a cousin to appellant, and had lived at his house for the past seven or eight years.  He was about thirty-eight years old and unmarried.  About six weeks prior to the killing of Shoat by appellant, he (appellant) requested Shoat to leave his home and seek quarters elsewhere, for the reason he was of the opinion that Shoat had assisted one of his young daughters to elope and marry without his consent.  On the night preceding the morning of this fatal difficulty, appellant's wife informed him that she had just discovered that their sixteen year old daughter, Etta, was pregnant.  His daughter informed her father, when he asked her about it, that Shoat had accomplished her ruin, and stated to him that the reason she had not disclosed it to him and her mother before was that Shoat told her, if she told it, he would kill her, and that if appellant, her father, said anything about it to him, he would kill him.  On the trial this statement was excluded from the jury.

Early next morning appellant, armed with a Winchester rifle, went at once to Henry Ward's house (where deceased lived), some two hundred or three hundred yards distant from appellant's house.  He claims that the object of his mission was to demand an explanation of the conduct of deceased, and to see what reparation he proposed to make for his treatment of his daughter.  On his arrival at Ward's home, he was told that deceased was not in, as he was out squirrel hunting.  Appellant retired, but returned a few hours afterwards, and was then informed that deceased was there.  He asked for him to come out to see him, and the state's witnesses

all say that deceased sent him word that he did not like to come out on a man with a gun. Appellant responded by saying that he meant no harm by carrying his gun, and that he did not intend to hurt him. Appellant started in the house, and did walk into the hall of the house, and as he got opposite or near to the door of the room in which deceased was, he (deceased) stepped out of the door unarmed to see appellant, and at that moment appellant instantly fired upon deceased with a Winchester rifle, but failed to hit him. Thereupon deceased grabbed the barrel of the gun, and each began to scuffle for it. While in this deadly struggle for the gun, appellant pulls a pistol from his pocket, still holding onto the gun, and fires two or three shots into the body of deceased. At that moment, deceased released his hold upon the gun, and staggered back, and fell from the hall or porch on the ground, apparently dead. Thereupon appellant raised his rifle and fired two shots into the body of the deceased as it lay on the ground. From the beginning to the end of this death struggle, not a word was uttered by either combatant.

Appellant's version of the affair was in substance this: That, when he asked for deceased, Henry Ward replied that "Shoat says he won't come out on a man with a gun;" that he then started in the house, consisting of two rooms and two sheds. The two large rooms were separated by a hall about seven feet wide. As he entered the hall, he did not know in which room deceased was, and that he directed his attention towards the east room, when suddenly the door of the west room was thrown open, and the first he saw of the deceased was when he grabbed appellant's rifle, and the deadly struggle for the weapon began. The record shows that both were about equal in strength, and it is claimed that Will Henry had been afflicted with rheumatism for several months, and had just recently discarded his crutches. He claims that the gun was discharged in the scuffle, the ball passing

through the door ranging downward through the floor. Appellant claims that they continued to struggle, each seeking possession of the gun, and that the gun was for the second time discharged, and that this shot struck Pointelle. He states about this time both fell from the porch, and that deceased released his grip on the gun, and then turned around, and then again advanced upon appellant with hands outstretched as if to seize him or the gun. Appellant claims that he then fired upon deceased and he fell dead. He further alleges that there were three shots fired, and that he did not fire into the body of deceased as it lay upon the ground. He bitterly denies having a pistol in his possession during the difficulty. Appellant further testified that his daughter had told him a short time prior to the shooting that "Shoat told her he would kill her if she said anything about it, and if I said anything to him about it he would kill me, too." Mose Faulkner testified that deceased said to him, in the presence of his wife, if he (Will Henry) ever fooled with him, "I am going to kill him." Annie Faulkner testified that three or four days before Christmas Pointelle said to her: "If Will Henry ever fooled with him, he was going to kill him." All of these statements were excluded by the court upon the objection of the state, and over the protest of defendant.

The foregoing is a brief abstract of the facts as contained in the record.

Appellant complains that the court committed error in refusing instruction No. 1. There is a slight error in this instruction; but upon an inspection of instruction No. 15, given the defendant, we are of the opinion that the principle of law sought to be invoked by instruction No. 1 was fairly stated in this instruction No. 15, given the defendant, which says: "That if the jury believe from the evidence that the defendant went to the house of Harry Ward to see Pointelle Echols about his daughter, and carried with him his Winchester rifle, and that

he started into the room where Pointelle was on a peaceful mission, and that Pointelle, when he was in no danger at the hands of defendant, real or apparent, sprang out and grabbed the rifle, and that said Pointelle attempted to wrench the rifle from defendant, and that defendant reasonably believed that he was in danger of suffering death or great bodily harm at the hands of the deceased, and drew his pistol and shot deceased while they were struggling over the rifle, and that Pointelle fell dead from the pistol shots, and after he was dead defendant shot him twice with his rifle, then the jury will find defendant not guilty.''

We will make this further observation. While it is true no man has any right to take the law into his own hands to avenge supposed or real grievances inflicted upon him or any member of his family, yet appellant did not violate this wise principle of law, if he, after learning of the deplorable condition of his daughter, inflicted upon her by the deceased, speedily sought deceased for an explanation and for a peaceful adjustment of the matter; and in seeking this end he had the further right, with the lights before him, to arm himself, not with the intention to provoke a difficulty, but to protect himself, if necessary, in self-defense. The vital question was whether the interview was sought with the deliberate purpose of provoking a difficulty, or was the interview sought in a friendly spirit to adjust the matter in some amicable way. If appellant, in attempting to adjust this matter, approached the deceased in the spirit as above indicated, and deceased, without any provocation on defendant's part, attacked appellant, by suddenly seizing his rifle, when appellant was not attempting to use same, and deceased attempted to wrench same from him, and he, appellant, reasonably believed that he was in real or apparent danger of his life or great bodily harm at the hands of deceased, killed him, he cannot be held, under such circumstances, guilty of murder. The Court of

Criminal Appeals of Texas, in two well-considered cases,. has maintained this principle.  *Shannon* v. *State,* 35 Tex. Cr. R. 2, 28 S. W. 687, 60 Am. St. Rep. 17; *Melton* v. *State,* 47 Tex. Cr. R. 451, 83 S. W. 823.  See, also, *Patterson* v. *State,* 75 Miss. 670, 23 South. 647.

Appellant further complains that the court erred in excluding the threats testified to in this case, and also of the refusal of instruction No. 2, which is as follows: ''In determining who was the aggressor in the fatal difficulty, and in determining whether deceased intended to use the rifle against defendant if he had secured the same, if they believed he attempted to secure same at the time of the fatal shots, they may take into consideration, together with all the evidence in the case, any threats which the evidence shows were made against defendant, whether such threats were communicated to him or not.  And in passing on the conduct of defendant, as to whether or not he reasonably apprehended an attack from deceased with a deadly or dangerous weapon at the time of the fatal shots, the jury will or may take into consideration, together with all the other evidence, any threats which the evidence shows were communicated. to the defendant, which were made by deceased against him.''  In the light of the facts of this case, the court erred in excluding the threats.  After the exclusion of the threats, the refusal of this instruction was correct. But if the threats had been admitted, as they should have been, the refusal of the instruction would have been error.  This court has held, time and again, that uncommunicated threats are admissible when there is a conflict in the testimony who was the aggressor, where they throw light on the significance of the acts of the deceased.  *Sinclair* v. *State,* 87 Miss. 330, 39 South. 522, 2 L. R. A. (N. S.) 553, 112 Am. St. Rep. 446; *Johnson* v. *State,* 54 Miss. 430.  From the record in this cause, it is manifest there was a conflict in the testimony as to whether defendant or deceased was the aggressor at the

time deceased was killed. These uncommunicated
threats were admissible. Some of the authorities, throw-
ing light upon this point in a more or less degree, are
Johnson v. State, 66 Miss. 192, 5 South. 95; Wiggins v.
Utah, 93 U. S. 465, 23 L. Ed. 941; Allison v. U. S., 160
U. S. 203, 16 Sup. Ct. 252, 40 L. Ed. 395.

It is contended by the prosecution that all these threats
were conditional, and were not admissible. The alleged
threats were: "If he speaks to me about it, I will kill
him, too." "If he tackles me about it, I will kill him."
"If he fools with me, I will kill him." Bear in mind
that at the time these threats were made the wrong of
the girl had been committed, but the appellant was in
ignorance of this; but the deceased knew it too well for
his own comfort, and doubtless his guilty conscience often
whispered to him, "And be sure your sin will find you
out." Indeed, the deceased knew all the time that, when
"swelling nature" unfolded this wrong, as it must, that
the father would say "something to him about it." He
at once sought the perpetrator of the deed, with intent,
according to his testimony, to adjust the unfortunate
affair in some amicable way, perhaps hoping that the
wrongdoer might make reparation by marrying the girl
he had wronged. Be this as it may, he had a right "to
speak to him about it" in the spirit and on the lines
heretofore indicated. On the morning of the fatal diffi-
culty appellant did then and there attempt "to speak
to him about it." The condition of the alleged threats
of deceased had materialized, and, if appellant's testi-
mony is true, deceased did then and there attempt to
make good his threats by an immediate attack upon him.
These threats were admissible, to throw light on the
significance of the acts of the deceased, and to further
aid the jury in determining who was the aggressor. It
was the exclusive province of the jury to say, with this
testimony in and this instruction given, what credit, if

any, they would give to the defendant's evidence and to his theory of the case.

For the error in excluding the threats, we think this case should be reversed and remanded.

*Reversed and remanded.*

PER CURIAM. The above opinion is adopted as the opinion of the court; and, for the reasons therein indicated by the commissioner, the case is reversed and remanded.