STEVENS *et al. v.* LOCKE.

(Division B.   Jan. 6, 1930.)

[125  So.  529.   No.  28079.]

Frierson & Weaver, of Columbus, and **J. A. Cunning-ham**, of Booneville, for appellants.

Geo. **T. Mitchell,** of Tupelo, and **Owen & Garnett,** of Columbus, for appellee.

Argued orally by **J. F. Frierson** and **J. A. Cunningham**, for appellant, and by **Geo. T. Mitchell**, for appellee.

**Ethridge, P. J.,** delivered the opinion of the court.

Mrs. Frances Stevens and her three daughters, the appellants, were plaintiffs in the court below, and sued the appellee, Thomas J. Locke, for damages for the wrongful killing of Wallace Stevens, the husband of Mrs. Frances Stevens, and the father of the three daughters. The killing occurred late on the night of December 24, 1927, in the store of Stevens, at which time there were two customers, Mr. and Mrs. Coward, the deceased, Stevens, and the defendant, Thomas J. Locke, in the store. Mr. and Mrs. Coward were witnesses for the plaintiff, and Mrs. Coward testified that Locke walked into the store around eleven-thirty P. M., and said, "Where is that guy, Wallace Stevens?" and that Mr. Stevens held out his hand and said, "Here he is," and that Mr. Locke pulled Mr. Stevens over, and said something, using obscene language, and Mr. Stevens asked him not to curse in the presence of ladies, that Mr. Locke struck the deceased, and that she then went to the rear of the store, and the next thing she heard was two pistol shots; that, after these shots, she started out of the store, and that Mr. Coward asked Mr. Locke not to curse any more because she was there, and Mr. Locke said, "I beg your pardon," and asked Mr. Coward to call a doctor or an ambulance; that she went out of the store and found Mrs.

Locke outside in a car, and that Mrs. Locke asked what had happened, and that she told Mrs. Locke that Mr. Locke had killed Mr. Stevens.

Mr. Coward testified that he and his wife were in Stevens' store on the night of the killing at the time Mr. Locke came in, and that Mr. Locke said, "Where is that guy, Stevens?" and Mr. Stevens said, "Here he is, right here," and held up his hand, and that Mr. Locke caught him by the hand and the back of the neck, pulled Stevens toward him, and called him a son of a bitch, and that Mrs. Coward ran toward the back of the store, and that he turned to see where she was going, and heard the snap of a pistol, and turned around, and that both men had guns pointed at each other, and that he ran back of a counter under some shelving, and two shots were fired while he was in that position, and that he did not see the shooting; that, after the shooting, Locke came where he was and asked him to 'phone for a doctor or an ambulance, and then said, "No use calling the doctor, call the undertaker; he is dead;" that Locke then said to him, "Son," or "Young man, you saw him pull his gun first, but he pulled it too damned late, didn't he?" "I told him I didn't know, that I didn't see either gun pulled;" that about that time he finished calling for the doctor and the ambulance, and that then a policeman named Stephens came in, and he (Coward) walked out. He also stated that Mrs. Locke came in shortly after the shooting, went where Mr. Locke was, and said to him, "What in the world has happened?" and Locke said, "I killed Mr. Stevens," or "I killed a fellow," and that he might have used an oath along with it, but the witness was too excited, and could not say for certain.

The defendant testified in his own behalf, in substance, that he and Stevens had not been on speaking terms for several years, but that he entertained no ill will toward Stevens, but that, on account of Stevens not being an easy person to do business with, he had discontinued sending his salesman to Stevens, Locke being a whole-

sale, and Stevens a retail, grocer, but that he had just scratched Stevens off because he returned merchandise and was not pleasant; that on Locke's part the feeling was friendly, and that he had nothing against Stevens. He further testified that, previous to this trouble, he and Captain Sharp, the mayor of Columbus, made a trip to New Orleans at Thanksgiving; that they had a conversation in reference to the feeling existing between Stevens and Locke, and that Captain Sharp asked him if he would give him (Captain Sharp) permission to see if he could not get the trouble between them patched up, and that he told Captain Sharp he would be glad to have him do so; that afterwards Captain Sharp told Locke, "I have seen Wallace, I saw him on Sunday morning and had quite a long talk to him." He said, "I'm not going to carry any message from Wallace to you and I didn't take any from you to Wallace, but you have my personal assurance that so far as Wallace Stevens is concerned everything is settled and you need not worry, he is just as good a friend as you have got." He said also, "You have my personal assurance that you will never have any trouble with Wallace Stevens any more."

Locke further testified that on the night of December 24th, being Christmas Eve, he went home early, and, after company left, he was arranging a Christmas tree and presents for his little daughter, and that, after finshing that, Mrs. Locke said to him that she must have some cherries for the next day; that he (the defendant) said they would go down town and see if they could find some; that he put his pistol in his pocket and went to the garage to get his car, and that his reason for putting the pistol in his pocket was that just a week or two before he had an occurrence on the Macon road in which somebody attempted to hold him up, and that he usually put his pistol in his pocket when he went to the garage, which was on a dark alley, and that he had no idea of going to the store of Stevens when he left home; that he went to certain other stores, such as the Clarence Saunders and Piggly

Wiggly, and found both of them closed, and came on down the street to the corner of the courthouse, turned there, and went up by the fire department, and, as he approached Stevens' store, he saw it was open, and thought that he could get some cherries there; that he drove up in front of the store, parked his car, leaving his wife in it, and went in the store and said, "Where is that guy, Wallace Stevens?" that this was one of the expressions he used among his friends, and he said, "Here I am," and held up his hand, and that he (Locke) said, "Let's cut out this durned talk, shake hands and be friends;" that he did not think Stevens knew who he was, but that Stevens looked up and saw Locke and said, "No, God damn you, I won't shake hands with you, and God damn you, you and I will never be friends," and that with that he reached under the counter and grabbed out a gun and put it in Locke's stomach and snapped it, and Locke testified that, "if the gun had gone off, I would have been the dead man;" that he (Locke) went then to his back pocket and pulled his gun out and shot twice as fast as he could; that Stevens fell after the second shot, and he stopped shooting.

The defendant introduced several witnesses who testified to uncommunicated threats made by Stevens against Locke prior to the difficulty. This testimony was introduced out of order over the objection and exception of the plaintiff, but, when the objection was made to this being so introduced, the attorneys for the defendant assured the court that Locke would take the stand as a witness, and would then make these threats competent, and that the purpose of introducing these witnesses out of order was that they could take Thanksgiving dinner at home, and the court, under this assurance, admitted the testimony out of order. One of these witnesses, Harry Wilson, testified that he was in Stevens' store shortly before this trouble came up, and Stevens told him that he had met Locke (using a vile epithet) the day before, and that if he had insulted him (Stevens) by

speaking to him he would have killed him (Locke), and said he was ready for him, and reached back under the shelf by the cash register and pulled out his pistol and said: "If the son of a bitch ever comes in that door, I will kill him," referring to Locke.

Another witness, Dave Sessums, testified that he was in Stevens' store one Saturday night, and that Stevens said, "Who is that out there talking and laughing so?" and, when told that it was Mr. Locke, said, "If that son of a bitch comes in here I will kick him out;" that Stevens always kept a pistol, and had one that night, but did not make any reference to it in his statement.

Another witness, Pat Hogan, testified that a few days before the killing he had a conversation with Stevens in his store; that this conversation occurred about the 17th of December before the killing on the 24th; that Stevens said he did not care to have anything to do with Locke in a business way, and, if he came into the store he would make him get out, and that, if he did not get out, said, "I have the difference here to make the God damned son of a bitch get out."

Mr. Harris, another witness, testified that he worked in the post office, and on or about the 18th of December he was working, and was the only man in the post office, and heard Stevens talking to somebody, and, when he closed the office and came out, Stevens was standing between two lights in front of the post office, and that he asked Stevens to tell him about whom he (Stevens) was talking a while ago, and Stevens said, "That God damned son of a bitch, Tom Locke;" that the witness said, "Surely, Mr. Stevens, you don't mean it that way," and Stevens said, "Yes, by God, I do. Tom Locke has run over me long enough, and has said things about me long enough, and I'm damned tired of them;" that he was going to have a settlement, and would settle things his own way, and witness said, "Surely, Mr. Stevens, you don't mean it that way. Take in consideration my father for the last four years. He has been in the penitentiary for kill-

ing a man, and I don't want it to happen to you," and that Stevens said, "All right, you attend to your part of the business, I know what I am doing."

Another witness, R. B. Talliaferro, testified that he was in Stevens' store a short time before the difficulty; that he had been buying some country hams from Stevens, and Stevens asked him if he wanted some, to which he replied he did, giving his address to Stevens that they might be shipped to his home; that he noticed some Brunswick stew on the shelves, a product of some friends of his, in Tennessee, and asked Stevens if he had sold much, and Stevens replied that he did until "this God damned son of a bitch, Tom Locke, bought a car load and distributed among my customers." The witness remarked that was bad, but that competition was the life of trade, and said, "If I were you Wallace, I wouldn't make such remarks. You are courting death," to which Stevens replied, "Don't you believe it, he knows how I feel," and made some very indecent remarks about his (Locke's) wife; and asked the witness if he would tell Locke, to which the witness replied that he would not convey a message of that kind to anybody, saying, "It would insult Mr. Locke and might cause your death. Far be it from me to mention it, but I want you to know you are courting death, and not that I love Locke less, but you more, and take my advice, and quit using those remarks, because any Southern gentleman will not allow you to call him a son of a bitch and talk about his wife." Stevens said, "That son of a bitch won't fight. He's got property close to my store but you never catch him coming by my store," and then went to his cash register and took out a pistol saying, "Talliaferro, when this thing barks, something drops." Witness said, "Wallace, that is a terrible thing to be contemplating, killing a man, or have a man kill you, and if you don't hush something is going to happen as sure as you live, and even if Mr. Locke is a coward, he has too much respect for himself and the community in which he lives to allow you to use

such language against him." He further told Stevens, "You may rest assured I won't say anything about it," but Stevens told witness he went armed for Locke, prepared for him.

It appears that, after the killing on the 24th of December, a preliminary trial in a justice of the peace court was had on December 31, 1927, and that at that trial the defendant, Locke, had procured a stenographer to take down the evidence given there. The plaintiff filed a petition for a writ of duces tecum to have the stenographer appear as a witness in the case, and then and there to produce and bring with her into court for examination to be used in the trial, if legally admissible, the stenographic notes of evidence taken down by said stenographer at the preliminary trial on said date, and to bring all transcribed notes that had been made by, or that were in the possession of, said stenographer or under her control. It was then alleged in said petition that the notes contained an accurate stenographic report of all the evidence given by Locke and other witnesses at the trial thereof, and that the evidence had become valuable and highly important in this cause of action, for the reason that it materially contradicted the evidence the defendant gave on his own behalf at the hearing of the case of the State v. Thos. J. Locke on the charge of murder at the regular September, 1928, term, "which petitioner is advised and reasonably expects the said defendant, Thos. J. Locke, will offer for and in his own behalf in the trial of this cause; that the said original notes contain the best record, and are the best records from the standpoint of law and also facts covering the said evidence, and there is nothing that would quite so well take the place of the said original notes;" that the issues in said cause were identical and grew out of the same state of facts, and that petitioner and her coplaintiffs have no other way of securing or obtaining said record. The court denied the petition apparently upon the ground that defendant, Locke, had hired and paid

the stenographer at the preliminary trial, the order denying the petition reading:

"The court having considered the said petition, which said petition was resisted by this defendant, and it appearing that the said stenographic notes were taken down by the Miss Daisy Rogers while she was employed by the defendant to take down and preserve the said testimony, the court is of the opinion that the said petition should be denied."

The assignment of errors with reference to the petition duces tecum logically presents itself for discussion first.

We do not think that the mere fact that the defendant hired the stenographer and paid her to take down the evidence at the preliminary trial would be a ground for refusing the writ. It appears in the evidence that the defendant, Locke, had procured a copy of the transcribed notes taken at the preliminary trial and had destroyed it.

In a civil suit, a defendant may be used as a witness by his adversary, and the evidence will not fall within any of the privileges when it was taken and transcribed; or, when the notes were taken, they would be available for use in other proceedings where such testimony would be relevant and pertinent.

It further appears in evidence that the defendant's testimony at the preliminary trial was proven by two witnesses, one of whom was the district attorney, and the evidence as related by these witnesses was different from the version given by the defendant on the trial.

We are further of the opinion that the petition was not sufficient because it did not allege that the witness then had the stenographic notes in her possession, nor did the petition allege the substance of what was expected to be proven by such notes. It does not sufficiently appear that the notes would have contradicted the witness, Locke, in any particular portion of his testimony. The relevancy of evidence should be

made to appear in the petition or proof before it would be reversible error to refuse to issue the writ.

Consequently, we are of the opinion that there was no reversible error in denying the petition for a subpoena duces tecum.

It is strenuously insisted that the evidence justified the plaintiff in requesting a peremptory instruction, that the killing was admitted, and that the defendant's evidence was so contradictory within itself, and so overwhelmingly unproven by other evidence, as to make it insufficient to sustain a verdict for the defendant.

We have carefully examined the evidence, and we think it was abundant to sustain the position of the defendant. If the testimony of the defendant was true throughout, as the jury had a right to find it was, then the killing would not be wrongful, and therefore no action for damages would lie. The court refused instruction III asked for by the plaintiffs, which instruction reads as follows:

"The court charges the jury for the plaintiffs that, even though you should believe the theory of the defendant, Thos. J. Locke, that he entered into the place of business of plaintiff's decedent, Wallace Stevens, for the purpose of effecting a reconciliation with the said Wallace Stevens of their personal differences, and with no fixed purpose of provoking a personal difficulty, or of resorting to the use of a deadly weapon concealed in his pocket at the time, yet, if you further believe from a preponderance of the evidence that he approached plaintiffs' decedent, Wallace Stevens, in Stevens' place of business, in such manner and with the use of such language, and at such time considering the relations existing between them at the time as he knew or as a man of ordinary prudence situated as he was at the time ought to have known, would likely put plaintiffs' decedent, Wallace Stevens, as a reasonable man, in fear that he, Stevens, was in danger of suffering immediate serious bodily harm or death at the hands of said defendant, Thos. J.

Locke, and that Stevens did so believe that he was in such perilous situation at the time and as a reasonable man made a recounter and resorted to arms for the purpose of protecting himself from such said real and apparent danger and thereby placed the defendant, Thos. J. Locke, in immediate danger of sustaining great bodily harm or death at the hands of Wallace Stevens, and that Thos. J. Locke shot and killed Wallace Stevens to protect himself from such dangerous situation, if any, so brought about by him in the first place, then it is your sworn duty under the law to find for the plaintiffs in this cause, and this even though you should believe from the evidence that at the time the defendant fired the fatal shot, that he, Thomas J. Locke, was in immediate danger of serious bodily injury or death at the hands of Wallace Stevens.''

We think this instruction was rightfully refused because it is long and complicated and is not supported in some particulars by the evidence. It appears from Mr. Coward's evidence that, at the time Locke accosted Stevens and used the language as stated, Locke had no weapon in his hand. Mr. Coward did not see what happened thereafter until he heard a pistol snap, and that, when he looked around, both parties had drawn pistols, and that he then ducked and saw nothing. It does not, therefore, appear sufficiently that Stevens had legal ground to believe that, at that time, he was in immediate danger of great bodily harm. It appears in the evidence that Locke's pistol did not snap; that Stevens' pistol had one blank chamber, and the testimony of the policeman indicated that, while it is the practice of many people to carry a pistol with one empty chamber for the purpose of preventing an explosion by accident—a safety device—sometimes mistakes are made and hammers of pistols are left on cartridges instead of empty chambers, and that this had occurred in the experience of several policemen. It appears, therefore, and the jury was war-

ranted in deeming that the pistol that snapped was Stevens' pistol. If Stevens drew his pistol and it snapped before Locke drew his pistol, then Locke would have a right to defend himself if he went into Stevens' store on a peaceable mission, as he testified he did, and did nothing that would indicate to a reasonable man an intent to use a deadly weapon. Furthermore, we think the court below gave to the plaintiffs an instruction which sufficiently set forth the theory intended to be presented of denial of the right of self-defense, wherein the defendant provoked the difficulty, said instruction reading as follows:

"The court instructs the jury for the plaintiffs that if you believe from a preponderance of the evidence that the defendant, Thomas J. Locke, entered the store building of the plaintiffs' decedent after arming himself with a deadly weapon concealed on his person with the intention of provoking a difficulty with the decedent, and to resort to such deadly weapon if necessary to overcome said decedent in whatever difficulty his, Locke's, maneuvers and conduct might reasonably be expected to bring about between him and decedent, then and in that event, the defendant, Thomas J. Locke, is bound, under the law, for the consequences of his own acts, and has, by his own acts, barred himself from setting up any right of self-defense, and you must find for the plaintiffs; and this is your duty under your oaths, even though you should believe from the evidence that he was in immediate danger of the loss of his own life at the hands of decedent at the very time he fired the fatal shot, unless you further believe from the evidence that he, the defendant, attempted to abandon the difficulty."

We have examined the other instructions given for the defendant and refused for the plaintiffs, and, without setting them out in detail, or giving the reasons for them being refused or given, we do not deem any of them to constitute reversible error. The instructions given

the parties, defendant and plaintiffs, are sufficiently applicable to announce the law to a jury.

We will next consider the assignment of errors in reference to the uncommunicated threats. The proof in the case made it doubtful as to who was the aggressor in the difficulty. We think the jury could have found one way or the other, according to their belief of whether the evidence was true or not, and by their right to draw deductions where the evidence was susceptible of more than one reasonable construction. It is well-settled law in this state that, where it is doubtful as to whom was the aggressor in the difficulty, threats made by the deceased, although not communicated to the defendant, are admissible as tending to show that the deceased was the agressor. Johnson v. State, 54 Miss. 430; Id., 66 Miss. 189, 5 So. 95; Mott v. State, 123 Miss. 729, 86 So. 514; Brown v. State, 87 Miss. 800, 40 So. 1009; Echols v. State, 99 Miss. 683, 55 So. 485; Clark v. State, 123 Miss. 147, 85 So. 188; Powell v. State, 145 Miss. 252, 110 So. 515, and Miles v. State, 99 Miss. 165, 54 So. 946.

We will next consider the assignment of errors with reference to introducing evidence out of order. The court below has the discretion to control the order of the introduction of evidence, and, unless this discretion is abused, this court will not reverse the trial court for the exercise of this discretion. In the case before us, the lower court was given the assurance by counsel that the defendant would testify in the cause, and that he would make the evidence competent. He did, in fact, testify, and, after his testimony was in, it was clearly competent, under the above authorities, to admit the threats. It is difficult to see how any prejudicial error resulted from admitting the threats first. If these threats had not been made competent by the evidence in the trial, it would probably have been reversible error, but such evidence, viewing the record as a complete trial, was admissible. We see no ground for reversal, because it was admitted out of order.

We do not deem it necessary to discuss the other assignments of error, as none of them are sufficient to cause a reversal of the cause.

The judgment will therefore be affirmed.

Affirmed.