EATON v. STATE.

(Division B.   April 11, 1932.)

[140 So. 729.   No. 29814.]

E. K. Windham, of Booneville, for appellant.

**W. D. Conn, Jr.,** Assistant Attorney-General, for the state.

134

J. A. Cunningham, of Booneville, and W. D. Conn, Jr., Assistant Attorney-General, for the state.

**Anderson, J.,** delivered the opinion of the court.

Appellant was jointly indicted with Clovis, Dell, and Edgar Eaton at the August term, 1931, of the circuit court of Prentiss county, of the murder of Clyde Rivers, a deputy United States marshal for the Northern District of this state. There was a severance granted appellant, who was tried, convicted of murder, and, the jury being unable to agree on the punishment, was sentenced by the court to life imprisonment in the state penitentiary. From that judgment, appellant prosecutes this appeal.

Some months prior to the killing of Rivers, appellant was convicted in the United States District Court for the Northern District of this state of violating the national prohibition act, and was sentenced by the court to pay a fine of two hundred fifty dollars, and serve a term of imprisonment of eighteen months. After six months' imprisonment he was paroled by the federal judge during good behavior. The federal judge, having knowl-

edge later that appellant had violated the terms of his parole, revoked it and ordered his arrest and imprisonment for the purpose of carrying out the judgment of conviction. Accordingly, a capias mittimus was issued by the clerk of that court for appellant, and placed in the hands of Clyde Rivers, a deputy United States marshal, for execution. The capias was issued on the 28th day of April, 1931. On Saturday, the 16th day of May of the same year, appellant came into the town of Booneville, the county seat of Prentiss county, at about one o'clock in the afternoon. Something like an hour later the city marshal of Booneville, Mr. Fulgham, arrested appellant and started to the courthouse with him. On their way to the courthouse appellant jerked away from Fulgham and fled down an alley and made his escape. Appellant then went to his home in the country and came back to Booneville about dark of the same day. Somewhere between eight and nine o'clock that night Curtis Morgan, a constable of the Booneville district, attempted to arrest the appellant but failed; some other person interfered; and, while Morgan was trying to make the arrest, appellant escaped. Immediately after the attempted arrest by the constable, appellant, together with his brothers Clovis, Edgar, and Dell Eaton, and two others, Tobe Morgan and A. K. Little, got in appellant's car, which was being driven by appellant. After driving around the courthouse square once or twice, appellant stopped at the Reed filling station and had water put in the radiator of his car. There were two shotguns in the car, and appellant was armed with a pistol. One witness testified that, while appellant and his companions were waiting for water to be put in the radiator of the car, Clovis Eaton remarked, "we are going to burn somebody down tonight;" some one on the back seat answered, "We have got the tools to do it with," to which Edgar Eaton replied, "Yes, we'll do it, too."

About the time these occurrences were happening, Rivers, the deceased, called on Earl Womack, a deputy sheriff of Prentiss county, to go with him and assist him in arresting the appellant. Rivers was seeking to execute the capias referred to. Rivers and Womack were passing Reed's filling station when they discovered the Eaton car driven by the appellant going west. Rivers and Womack followed in their car for about two miles, when they overtook the Eaton car, which stopped on the right-hand or north side of the road. Just as the car occupied by Rivers and Womack came up to the Eaton car, one shot was fired by some one in the Eaton car. Womack, the deputy sheriff, testified that as they overtook the Eaton car he saw two men jump from that car and go through a fence on the north side of the road, the fence being something like three feet from the road; that he stopped his car a little in front of the Eaton car, and, as he did so, Rivers sprang to the ground, approached the Eaton car, declared himself the United States deputy marshal, and stated that he had a capias for the arrest of appellant; that immediately, upon making this statement, Edgar Eaton appeared on the scene and engaged in some sort of scuffle with Rivers; while thus engaged, Rivers requested the witness to get a gun out of the Eaton car which he had evidently seen; that about this time Rivers disengaged himself from Edgar Eaton and struck him on the head with his pistol, knocking him down, and thereupon shots were fired from a northwesterly direction, the direction taken by the other Eatons in their flight from the car. The evidence showed that many buckshot struck Rivers in the back and the side of his body, from the effects of which wounds he died within a few minutes.

Dave Griscoll lived a short distance from where the killing took place. He testified that after the killing, and between nine and ten o'clock that night, appellant and

Clovis Eaton came to his home and hollered "hello;" that he found them in the back yard; that they stated that a man had been shot up the road, and said, "We are going to take your car, you will find it at Pap's in the morning;" that they took the car, and the next morning he found it at his father's; that appellant had a pistol; and that Clovis had a gun of some description, it was long.

Alma Gullett, a witness for the state, testified that on the 6th or 7th of May, the month in which Rivers was killed, she was with appellant; that they had made a trip together up into Tennessee; that on that trip they met a car that had a puncture; that there was a car on the other side of the road from it; that appellant, on seeing these cars, said "he guessed it was the law trying to arrest him and said it took one time to die and he didn't aim for any law to take him, he knew he had broken his parole, but he didn't aim for nobody to put him in jail . . . he reached over in the pocket of the door and said he didn't aim for anybody to take him and got his pistol." and said he heard the government officers were after him.

The evidence did not show who fired the fatal shot or shots. It was at night. The evidence showed, however, that the shots came from the direction in which the Eatons had gone when they were overtaken by Rivers and Womack.

Appellant assigns and argues as error the action of the court in ruling out certain questions propounded by appellant to the jury on their voir dire examination. Before setting out those questions, however, we will set out the questions which the court did permit the appellant to propound to the jury, and also the questions which the court itself propounded to the jury, to all of which the jury gave negative answers. Appellant was permitted to ask these questions: "I want to know have any of you formed any opinion of the guilt or innocence of

Dell, Clovis or Edgar Eaton indicted jointly? Have you formed or expressed any opinion with reference to this: If any of you have formed any opinion with reference to these three, would such opinion influence you against this defendant, Rouey Eaton?'' The court asked these questions: ''Should the evidence show that any of these three killed the man, would that influence you against this defendant? If you are convinced that some one in the car killed Clyde Rivers and you should believe beyond every reasonable doubt that this defendant knows who did it and he should refuse to identify the actual slayer, would that influence you against the defendant in any way? Would the fact that the Federal government has special counsel employed for the purpose of prosecuting this boy embarrass you in the trial of this case? Would the fact that the United States Government employed special counsel to assist in the prosecution of this cause influence you one way or the other in the trial of this cause?''

The questions propounded by appellant and ruled out by the court were as follows: ''Would the fact that the United States Government is actively participating in the prosecution of this boy, and you should believe from the evidence produced in this trial and from the action of the Federal authorities whether he is guilty or whether he is innocent''—ruled out by the court on objection before the question was completed. ''The fact that you might be convinced before this trial is over that if you should fail to convict this defendant that it might jeopardize your liberty in any way, that the Government might trump up some fictitious charge against you as the result of your failing to convict this defendant''— objected to and ruled out before the question was completed. ''Would the fact that immediately following the alleged slaying of Clyde Rivers the federal authorities made wholesale arrests without any warrant whatever and without any probable cause therefor and imprisoned

something like forty innocent men because they were either relatives, neighbors or friends of this defendant so embarrass you in the trial of this case that you could not give this boy a fair and impartial trial?'' State's objection sustained. ''Would the fact that during the investigation of the alleged killing of Clyde Rivers the federal authorities drove hundreds of citizens from this court house and from the court house yard and insulted and intimidated several hundred of the citizens of this county, cause you to fear them to such an extent that you would be afraid to acquit this boy if the state should fail to prove beyond every reasonable doubt that he is guilty?'' State's objection sustained. ''Would the fact that because you fear the federal authorities and have reason to believe that should you fail to convict this boy regardless of the testimony, you might be punished by the federal authorities, cause you in any way to be afraid to give this boy a fair and impartial trial?'' State's objection sustained. ''Would the fact that Clyde Rivers was a United States deputy marshal, and that the government is here vigorously prosecuting with the marshal and deputies in attendance in this court, influence you in any way in the trial?'' State's objection sustained.

Section 2030, Code of 1930, provides: ''Any person, otherwise competent, who will make oath that he is impartial in the case, shall be competent as a juror in any criminal case, notwithstanding the fact that he has an impression or an opinion as to the guilt or innocence of the accused, if it appear to the satisfaction of the court that he has no bias or feeling or prejudice in the case, and no desire to reach any result in it, except that to which the evidence may conduct; but any juror shall be excluded, if the court be of opinion that he cannot try the case impartially, and the exclusion shall not be assignable for error.''

To sustain his position that the court erred in ruling out these questions to the jury, appellant cites the case

of Hale v. State, 72 Miss. 140, 16 So. 387, 389. We do not think the Hale Case is at all in point. The questions propounded to the jury in that case, as set out in the opinion of the court, were as follows: "Have you formed any opinion as to the guilt or innocence of J. G. Robertson, jointly indicted with the defendant? Have you expressed any opinion against the defendant or the said Robertson? Have you ever stated that the opinion which you had as to one applied to the other, according to the rumor you had heard? Whether, if you have formed any opinion as to the said Robertson, such an opinion would influence your verdict against the defendant Hale. Or whether or not, in your opinion, you could disconnect the judgment you had formed of the guilt or innocence of Robertson from Hale. Whether or not, having formed an opinion as to the guilt or innocence of Robertson, such an opinion would influence your verdict in this case."

It will be observed that the questions which the court permitted the appellant to propound to the jury, in connection with the questions propounded to the jury by the court, met every requirement of the Hale Case. One trouble about most of the questions propounded to the jury by the appellant is that they assumed a state of facts which were not shown to exist. If the appellant had made an application for a change of venue, the facts assumed in his interrogatories to the jury, if shown to be true, might have been pertinent. We do not think appellant's rights were prejudiced by the action of the court on the voir dire examination of the jury.

Appellant made a motion for a subpoena duces tecum to have the United States attorney for the Northern District of this state and Houston Wood, the official court stenographer of the United States District Court of that district, produce on the trial of this cause the transcribed notes of the evidence taken by those officials on an investigation of the killing of Rivers had shortly after it occurred. Appellant asked either for the original or a

copy of the proceedings, including the evidence taken down. He set out in his motion, in substance, that during that investigation among other witnesses examined were A. K. Little, Tobe Morgan, Jude Baggitt, Earl Womack, Alma Gullett, Ulysses Orff, Earl Yancey, Douglas Martin, D. S. Windham, Emmett Surratt, Gene Barnett, and Joe Baggitt, and that the same witnesses had been subpoenaed in this case on behalf of the state, and that he had been informed and believed that the testimony of these witnesses to be given on the trial of this cause would be materially different from that given at that investigation, and that he had no way of contradicting or impeaching the testimony to be given by the witnesses on his trial, except by the introduction of the records containing the testimony given in that investigation. The court denied the appellant's motion for the subpoena. This action of the court is assigned and argued as error. Section 744, Code of 1930, provides as follows:

"The court in which any action or suit is pending may, on good cause shown, and after notice of the application to the opposite party, order either party to give to the other, within a specified time, and on such terms as may be imposed, an inspection and copy, or permission to take a copy, of any books, papers, or documents in his possession or under his control containing evidence relating to the merits of the action or proceeding or of the defense thereto; and if compliance with such order be refused, such books, papers or documents shall not be given in evidence in the action or proceeding by the party so refusing; and the court may punish the recusant party as for a contempt of court; and if a complainant, or plaintiff, fails to comply with such order, the court may, on motion, give the like judgment for the defendant as in cases of nonsuit or dismissal; and if a defendant fails to comply with such order, the court may, on motion, give judgment or decree against him by default or confession."

In Stevens v. Locke, 156 Miss. 182, 125 So. 529, 533, where one of the parties sought to obtain by a subpoena duces tecum a transcript of the evidence adduced in a criminal prosecution of the other party, to be used in the case then on trial, the court denied the writ on the ground, among others, that the petition therefor failed to set out the substance of what was expected to be proven by the transcribed notes. The court held: "The relevancy of evidence should be made to appear in the petition or proof before it would be reversible error to refuse to issue the writ." We think the application for the writ in this case failed to meet the requirements of the law.

Appellant assigns as error the giving of the following instruction for the state: "The court instructs the jury that malice aforethought, mentioned in the indictment, does not have to exist in the mind of the slayer for any given length of time; and if at the very moment of the fatal shot the defendant, Rouey Eaton, shot with the deliberate design to take the life of Clyde Rivers and not in necessary self defense, real or apparent, then it was as truly malice, and the act was as truly murder, as if the deliberate design had existed in the mind of Rouey Eaton for minutes, hours, days, or weeks, or even years."

Appellant argues that the fault of the instruction is that it assumes as a fact that he fired the fatal shot. On careful analysis of the instruction it appears to be subject to that criticism. However, the ordinary reader would not so understand it. The main purpose of the instruction was to define malice aforethought. It is apparent that the fault in the instruction was brought about by a clerical error in inserting the word "if" after the word "and" and before the words "at the very moment of the fatal shot," instead of inserting it after the word "shot" and before the words "the defendant, Rouey Eaton." So arranged, the instruction would have been in proper form and applicable to the case. Appellant

obtained twenty-five instructions from the court presenting every conceivable feature of his defense. The jury was plainly informed by the court in more than one of those instructions that it was a question for the jury under the evidence whether the appellant fired the fatal shot or not. We are therefore of the opinion that the error in the instruction complained of was entirely harmless—it could not have misled the jury.

Appellant further assigns and argues as error the giving of the following instruction for the state: ''The court instructs the jury, that if you believe from all of the evidence in this case, beyond a reasonable doubt, that at the time Clyde Rivers was killed that Rouey Eaton either fired one of the shots which struck him, or fired one of the shots at him, or in any way aided or abetted the person or persons who did the killing of the said Rivers then in that event the said Rouey Eaton is as guilty as though he himself had fired the shot which caused said Rivers' death.''

The basis of appellant's objection to this instruction, as we understand it, summed up, means that there was not sufficient evidence to go to the jury to show a conspiracy between appellant and his codefendants to kill Rivers, if necessary, to avoid the arrest of appellant. The evidence of the conspiracy, it is true, was circumstantial to some extent, but in other respects it was positive and direct, and we think was amply sufficient to show that appellant and his codefendants confederated and conspired to kill Rivers, if necessary, in order to prevent him from arresting the appellant, and that appellant either fired the fatal shot or shots that killed Rivers, or was present aiding and abetting the one who did fire the fatal shot or shots in furtherance of the conspiracy. We are of the opinion that the instruction complained of embodied correct and applicable principles of law.

We are of opinion that appellant had a fair and impartial trial, and that whatever error may have been committed by the court was insignificant and harmless.

Affirmed.